IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOHN DOE                          )
                                  )
v.                                )      No. 3:73-6971
                                  )      Judge Trauger/Bryant
BEVERLY BRILEY, ET AL.            )


To:  The Honorable Aleta A. Trauger, District Judge


## REPORT AND RECOMMENDATION

        This class action lawsuit was referred to the
Magistrate Judge on July 21, 2006, for case management, ruling on
all nondispositive motions, and recommendation for ruling on all
dispositive motions (Docket Entry No. 4).  On August 14, 2006,
Magistrate Judge Griffin transferred the case to the docket of
the undersigned (Docket Entry No. 15).  Currently pending are the
following four motions: (1) plaintiffs' motion for further relief
to assure compliance with the 1974 consent decree entered by the
late Judge L. Clure Morton (Docket Entry No. 2); (2) the motion
by *The Tennessean* newspaper to intervene (Docket Entry No. 5);
(3) the motion by the Tennessee Bureau of Investigation (TBI) to
dissolve consent order (Docket Entry No. 8); and (4) the motion
by the Metropolitan Government of Nashville and Davidson County
to vacate consent decree (Docket Entry No. 11).  For the reasons
given below, the undersigned recommends that plaintiffs' motion
to assure compliance be **GRANTED** in part and **DENIED** in part, with

1

allowance for limited discovery by plaintiffs as described herein; that *The Tennesseean's* motion to intervene be **DENIED**; and that defendants' motions to dissolve or vacate the consent decree be **DENIED**.

## I.  Introduction

<u>The Prior Litigation, Settlement, & Judgment</u>

On April 12, 1973, plaintiff John Doe, individually and on behalf of all others similarly situated, filed a verified complaint under 42 U.S.C. § 1983, against the Metropolitan Government of Nashville and Davidson County (hereinafter, "Metro") and the State of Tennessee, naming the following defendants in their official capacities: the Mayor of Nashville; the Nashville Chief of Police; the Nashville Assistant Chief of Police; the three members of the Davidson County Public Records Commission; the Chairman of the Davidson County Civil Service Commission; the Secretary of the Davidson County Civil Service Commission and Director of Personnel for Metropolitan Nashville Government; the Director of Personnel for the Metropolitan Nashville Board of Education; and, the Director of the Tennessee Bureau of Criminal Identification (TBCI) (predecessor of the Tennessee Bureau of Investigation (TBI)).

The verified complaint alleged that, following plaintiff Doe's arrest in the summer of 1972, he was

2

fingerprinted and photographed, and the record of his arrest as well as the fingerprints and photograph were transmitted to the Federal Bureau of Investigation (FBI) and the TBI. Several months later, the charges against plaintiff Doe were dismissed. The verified complaint alleged that the Police Department and Public Records Commission defendants maintained and disseminated records of arrest, regardless of the disposition of the matter which prompted the arrest. It was further alleged that the Civil Service Commission and the Board of Education required applicants for employment to identify past arrests in their application forms, that these defendants relied upon such arrest information as a factor in employment decisions, and that plaintiff and others similarly situated were thus prejudiced in any application for employment with Metro. The verified complaint alleged constitutional claims based on violations of plaintiff's right of privacy, his right to due process of law, and his right to equal protection of the laws.

Plaintiff, on behalf of the purported class, sought declaratory and injunctive relief. Among the remedies requested, plaintiff prayed that the Court declare unconstitutional the provision of the Metropolitan Code of Laws which dealt with the Public Records Commission (currently codified at Chapter 2.140 of the Code), "as applied to the maintenance and dissemination of arrest records of those arrested but whose cases were dismissed

3

before trial, or in whose case a no true bill was returned by the Grand Jury, or where a final decision has been made not to proceed with prosecution." (Original[1] Docket Entry No. 3, ¶ 31(B); Docket Entry No. 19, Att. E, ¶ 31(B))  Plaintiff further requested that the practice of maintaining and disseminating such information be declared unconstitutional, and that such records be expunged from their repositories.  Also, plaintiff requested that defendants be permanently enjoined from <u>maintaining</u> "any records of arrest, after the charges for which the arrest was made have been dismissed by the District Attorney General's Office, by the Grand Jury, or by any authorized body or individual capable of finally disposing of said charges." (<u>Id.</u> at ¶ 31(H))  Plaintiff further requested that defendants be permanently enjoined from <u>transmitting</u> such arrest information to the FBI, TBI, or National Crime Information Center (NCIC) "until and unless such arrests have resulted in a criminal trial or conviction." (<u>Id.</u> at ¶ 31(I))  A permanent injunction was also requested against defendants' <u>disseminating</u> such records to private individuals "unless and until such arrests have resulted in a criminal trial or conviction, except wherein the arrested

---

[1]The original record of proceedings in this case is comprised of forty-two docket entries, beginning with the original plaintiff's filing of a motion to proceed under a pseudonym and <u>in</u> <u>forma</u> <u>pauperis</u> on April 12, 1973, and concluding with a notice of appeal to the Sixth Circuit Court of Appeals filed by the plaintiff class on August 2, 1974.  Plaintiffs' appeal of Judge Morton's denial of their motion to alter or amend the judgment was handled in summary fashion by the Sixth Circuit, which affirmed that denial without opinion.  <u>Doe v. Briley</u>, 510 F.2d 972 (6th Cir. Jan. 15, 1975).

4

person has specifically authorized such release." (Id. at ¶ 31(J))  It was further requested that defendants be ordered to update disposition information with respect to any arrest records they were allowed to maintain, and that plaintiff and others similarly situated be permitted to deny the existence of any arrests which were terminated in their favor, upon being asked about prior arrests by defendants or nonparties.  Finally, plaintiff prayed that defendants' practice of requiring such arrest information as a prerequisite to government employment be declared unconstitutional, and that defendants be permanently enjoined from requesting, obtaining, or using any such information when considering applicants for government employment.

On September 10, 1973, Judge Morton entered the following stipulated Order (hereinafter, "the 1973 decree"):

> In recognition that fundamental constitutional rights of liberty and privacy are threatened by the use of arrest information by employers, the Metropolitan Government of Nashville and Davidson County Tennessee will henceforth refrain from inquiring about, obtaining, or using any information regarding any arrests which have not resulted in a criminal trial or conviction for criminal activities, when considering applicants for employment with the Metropolitan Government or the Metropolitan Board of Education at the present or in the future.
> This order is entered pursuant to stipulation of the parties evidenced by their attorneys' signatures below, and is agreed to be dispositive of the issues raised in Plaintiff's complaint paragraphs 10, 11, 12, 24, 25, 26, 27, 29, 30(m) and 30(n).

(Original Docket Entry No. 17; Docket Entry No. 19, Att. A)

5

On September 19, 1973, Judge Morton entered an Order authorizing the maintenance of this case as a class action, with the plaintiff class defined as "those individuals who have been arrested by the Metropolitan Nashville Police Department on state charges other than traffic violations or violations of the Metropolitan Code, but whose cases were not brought to a criminal trial, have not resulted in a conviction, or were terminated by a dismissal or no true bill returned by the Grand Jury." (Original Docket Entry No. 16; Docket Entry No. 19, Att. F)

On September 20, 1973, the parties submitted a joint motion for continuance of the trial date, wherein the parties "propose[d] to agree that in the future arrest records will not be available for public inspection," and further advised that "[a]n ordinance will be submitted to the Metropolitan Nashville-Davidson County Council to repeal Section 34-1-11 of the Metro Code which presently requires public disclosure of arrest records[.]" (Original Docket Entry No. 18; Docket Entry No. 19, Att. G) Judge Morton granted the continuance the following day, September 21, 1973.

On February 8, 1974, the parties filed cross-motions for summary judgment on stipulated facts (Original Docket Entry No. 31). Having already agreed to consent orders disposing of issues related to government solicitation, use, and dissemination of arrest information in the absence of conviction, the parties

6

executed and the Court entered a pretrial order which defined the remaining issue as "[w]hether the defendants may maintain records indicating arrests of individuals by the Metropolitan Government of Nashville defendants where no conviction ensues or no final disposition is made within a reasonable time." (Original Docket Entry No. 32, ¶ 5(a))  Three subsidiary issues were also identified in the pretrial order.

On March 22, 1974, Judge Morton approved the entry of the twenty-seven stipulations submitted by the parties (Original Docket Entry No. 34; Docket Entry No. 19, Att. H).  Among other things, the parties stipulated that Metro maintained at Central Records Service a single copy of a person's arrest records, regardless of the disposition of the matter that caused the arrest.  (Id. at ¶¶ 3-5)  They stipulated that prior to November 21, 1973, a Metro Code section allowed dissemination of arrest records to any individual upon request and the payment of one dollar, but that after the repeal of this Code section on said date, Metro adopted the policy of limiting access to its arrest records to (1) any local, state, or federal law enforcement officer or agency for official business purposes and (2) only such non-law enforcement government agencies as are specifically required by law to determine whether or not a person has been convicted of a felony or other crime.  (Id. at ¶¶ 6-7; Docket Entry No. 19, Att. I)  Metro's new policy also provided that

7

"[n]o arrest records or information concerning lack of same will be released to any representative of private business or industry or for use by private business or industry," and specifically identified the 16 law enforcement agencies to whom arrest records could be released. (Docket Entry No. 19, Att. I)

The parties further stipulated that Metro routinely transmitted arrest records to the TBCI and NCIC, and that upon such transmission those records were available to any participating agency in the United States or Canada, including virtually all Tennessee criminal justice agencies. (Original Docket Entry No. 34 & Docket Entry No. 19, Att. H, ¶¶ 11-12, 16-18) It was also stipulated that "[o]nce the information is given to the NCIC and the TBCI or authorized agencies identified [in Metro's written policy], the Metropolitan Police Department has no control over the further dissemination of the information. The parties recognize that access to arrest records by persons seeking to employ, promote, grant credit, bond, license or lend money to such an individual with an arrest record may impair the arrestee's ability to obtain those benefits. Public dissemination of such arrest records can cause damage to the reputations of arrestees in the community." (Id. at ¶ 23) Finally, it was stipulated that plaintiff and other class members are or may be indigent, and that some class members would be unlikely or unable to determine that they have a right to

petition for expunction of their arrest record, or would be incapable of making such a petition upon learning of that right. (Id. at ¶¶ 25-26)

On the same day that the parties' stipulations were entered, March 22, 1974, Judge Morton entered the consent decree at issue today (hereinafter, "the 1974 decree") (Original Docket Entry No. 35; Docket Entry No. 19, Att. B). The operative, injunctive provision of the 1974 decree is as follows:

> 1.  The Metropolitan Government of Nashville defendants, their successors, their agents, their employees and others acting under their supervision or control shall hereinafter limit access to the records of arrest under their control as follows:  the arrest records maintained by the Metropolitan Government of Nashville of persons arrested by the Metropolitan Government of Nashville but who are not convicted of the charges upon which the arrest was predicated will be revealed only to law enforcement agencies and only for official law enforcement purposes; the only agencies to which such access may be afforded and the procedures to be followed are those listed in the document entitled "Policy Governing Release of Arrest Records by Central Records," attached hereto as Exhibit B.  The Metropolitan Government of Nashville defendants and the State of Tennessee defendant, his successors, agents, employees and those under his supervision and control are hereby enjoined from disseminating such arrest records as above described except to such law enforcement agencies for official law enforcement purposes.

The final provision of this decree states that "[t]his court reserves jurisdiction over this matter to assure compliance with this and any subsequent Order."  (Id. at ¶ 6)

By Order and accompanying Memorandum entered May 28, 1974 (Original Docket Entry Nos. 37, 38), Judge Morton denied the

9

plaintiff class any relief outside of that embodied in the consent decrees, found that the government practice of maintaining arrest records and disseminating such records only to designated law enforcement agencies did not violate any constitutional rights of the class, and dismissed the case. Plaintiffs subsequently filed a motion to alter or amend the judgment based on the overruling of a decision that was cited in the Court's Memorandum, but Judge Morton denied the motion to alter or amend on June 10, 1974 (Original Docket Entry No. 40). Plaintiffs took an appeal to the Sixth Circuit Court of Appeals from both the final judgment against them and the denial of their motion to alter or amend that judgment. (Original Docket Entry Nos. 41, 42) The Sixth Circuit affirmed Judge Morton's rulings without opinion on January 15, 1975. <u>Doe v. Briley</u>, 510 F.2d 972 (6th Cir. Jan. 15, 1975).

<u>Current Events and Proceedings</u>

On July 17, 2006, more than thirty-two years after the entry of the 1974 decree, the plaintiff class filed their motion to assure compliance (Docket Entry No. 2). This filing was evidently prompted by *The Tennessean's* publication of an article on June 22, 2006, which publicized the Metro Police Department's year-long practice of posting to the Metro website pictures of alleged "johns" (patrons of prostitution) and other individuals arrested in prostitution stings. (Docket Entry No. 3, Att. 1)

10

Class counsel's investigation revealed the website,
http://www.police.nashville.org/ppa/default.htm, where thirty-
eight such arrestees were pictured.  The site also provided each
arrestee's name, and in most instances their date of birth and
the charge of arrest.  In view of what counsel regards as
defendants' clear violation of the 1974 decree, plaintiffs'
motion to assure compliance makes the following requests:

1.  That this Court restore this case to its active docket
    under its inherent authority to enforce its own orders
    and under its "reserve[d] jurisdiction" authority to
    "assure compliance" with the terms and provisions of
    its March 22, 1974, Order and other relevant orders
    entered during the course of this litigation.

2.  That, in general and in compliance with its obligations
    under the March 22, 1974, Order, this Court order Metro
    and the State of Tennessee to refrain from
    disseminating and otherwise providing general access to
    arrest records they maintain unless and until the
    arrested persons in question are convicted of the crime
    for which they have been arrested.

3.  That, in specific and in compliance with its
    obligations under the March 22, 1974, Order, this Court
    (a) order Metro to dismantle root and branch, effective
    immediately, its website
    (http://www.police.nashville.org/ppa/default.htm)and to
    cease and desist from posting or otherwise releasing on
    its web site or elsewhere arrest records and/or
    photographs or arrested persons who have not been
    convicted of the crimes for which they were arrested
    and (b) order Metro and the State of Tennessee to limit
    dissemination of and access to such arrest records to
    law enforcement agencies for law enforcement purposes.

(Docket Entry No. 2 at 2-3)  In addition, as further clarified in
their supporting memorandum, plaintiffs request that the Court
order as follows:

11

[4.] (a) that Metro and the State perform a detailed and comprehensive self-study to investigate the actual facts and circumstances regarding relevant practices and procedures; (b) that Metro and the State perform a detailed and comprehensive self-assessment to determine how the actual situation comports with the obligations imposed on the defendants under all elements of the orders entered in this litigation; and (c) that the self-study and self-assessment be presented in a detailed, candid, and comprehensive analytical report within sixty (60) days of the entry of this Court's Order to this Court and to plaintiff class counsel for analysis and evaluation.  The report should provide the data of the self-study and the self-assessment, along with an analysis of the self-study and self-assessment regarding the compliance status of relevant practices and procedures.

(Docket Entry No. 3 at 6)

          In response to these requests, the Metro defendants have disputed plaintiffs' construction of the language of the 1974 decree, particularly in light of the public's interest in access to arrest records, and have moved for the dissolution of that decree based on changes in the underlying decisional law involving the constitutional rights to privacy and due process, and the satisfaction of the objectives of the decree (Docket Entry Nos. 11, 12).  The State defendant has also moved for the dissolution of the 1974 decree, citing significant changes in decisional law.  Meanwhile, *The Tennessean* has moved to intervene in the matter, citing its constitutional and statutory rights of access to public records.  The undersigned will address these issues in the order recited above.

12

## II.  Discussion and Recommendations

       Consent decrees have elements of both contracts
and judicial decrees.  *Firefighters v. Cleveland*, 478
U.S. 501, 519, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986).
A consent decree "embodies an agreement of the parties"
and is also "an agreement that the parties desire and
expect will be reflected in, and be enforceable as, a
judicial decree that is subject to the rules generally
applicable to other judgments and decrees."  *Rufo v.
Inmates of Suffolk County Jail*, 502 U.S. 367, 378, 112
S.Ct. 748, 116 L.Ed.2d 867 (1992).  Consent decrees
entered in federal court must be directed to protecting
federal interests.  In *Firefighters*, we observed that a
federal consent decree must spring from, and serve to
resolve, a dispute within the court's subject-matter
jurisdiction; must come within the general scope of the
case made by the pleadings; and must further the
objectives of the law upon which the complaint was
based.  478 U.S., at 525, 106 S.Ct. 3063.

Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004).


                  The Language of the 1974 Decree

       The Metro defendants challenge plaintiffs' construction

of the language of the 1974 decree, asserting that the decree by

its plain language does not apply to the subjects of the

prostitution sting.[2]  Metro argues that the 1974 decree must be

read in the context of the litigation which produced it, and that

the events which formed the backdrop for the proceedings in 1973,

combined with the definition of the plaintiff class, dictate that

the injunction against disseminating arrest records "applies only

_____

       [2]The TBI appears to concede that "[u]nder the terms of [the 1974
decree], TBI agreed to the entry of an injunction prohibiting any future
dissemination of records of persons in Metropolitan Nashville Davidson County
who had been arrested but not convicted of criminal activity."  (Docket Entry
No. 9 at 1)

                                   13

to those cases in which the disposition is something other than conviction—not to every case 'unless and *until*' conviction." (Docket Entry No. 12 at 5)  The undersigned is not persuaded by this argument.

The 1974 decree prevents defendants' dissemination of arrest records, other than to designated law enforcement agencies for official law enforcement purposes, of those "persons arrested by the Metropolitan Government of Nashville but who are not convicted of the charges upon which the arrest was predicated[.]" While Metro argues that the decree does not say that it applies to persons who "are not yet convicted," neither does it say that it applies to persons who "were not convicted" or "are not ever convicted."  Moreover, the fact that the verified complaint closely followed the newly enacted Tennessee expungement law is of no consequence to the construction of the language of the 1974 decree.  As Metro notes, plaintiffs originally sought an order from this Court requiring the retroactive application of the 1973 expungement statute, so that plaintiff Doe and others who were arrested prior to the statute's effective date of July 1, 1973, could benefit from its protections.  However, this request was based on the public law which the final codification tracked, when in fact the statute as finally enacted itself provided for the retroactivity plaintiffs sought.  When class counsel recognized the redundancy of his request, he corrected the matter

14

in a letter to Judge Morton (Original Docket Entry No. 12). In
that letter, counsel acknowledged that "[u]nder the new law as
finally enacted, the substance of Plaintiff's grievance in this
case is largely taken care of by state law." (Id.) However,
counsel stated that he would continue to contest the statute's
placement of the burden of seeking expunction on the "innocent
arrestee," and further preserved his claims related to the use by
the government as an employer of any information related to "past
arrests (as distinguished from convictions)" (Id.). Accordingly,
the fact that counsel recognized in the infancy of this
litigation that plaintiff Doe, and others like him who had seen
the charges against them dismissed, would benefit from the 1973
expunction law hardly indicates that plaintiffs' case was
thereafter prosecuted with tunnel vision toward relieving only
such arrestees whose "past arrests" had been invalidated.

Metro further argues that plaintiffs' definition of the
class in their verified complaint is the source of the 1974
decree's language "but who are not convicted" (Docket Entry No.
12 at 5). As recited in Metro's brief, plaintiffs sought
certification of the class of people "arrested but whose cases
were dismissed before trial, or in whose case a no true bill was
returned by the Grand Jury, or where a final decision has been
made not to proceed with prosecution." Again, the undersigned is
uncertain as to the basis for Metro's argument that this opening

15

volley by plaintiffs defined the parameters of the decree entered nearly a year later, particularly since the class as ultimately certified by the Court was defined to include "those individuals who have been arrested by the Metropolitan Nashville Police Department on state charges other than traffic violations or violations of the Metropolitan Code, but whose cases were not brought to a criminal trial, have not resulted in a conviction, or were terminated by a dismissal or no true bill returned by the Grand Jury." (Original Docket Entry No. 16; Docket Entry No. 19, Att. F) Surely the Court's inclusion of individuals who "have been arrested" but whose cases "have not resulted in a conviction" did not forswear application of the 1974 decree to those against whom charges remain pending. Indeed, the language from Judge Morton's Memorandum, cited by Metro (Docket Entry No. 28 at 7), would seem to prove this point: "Plaintiff represents the class of persons who have been arrested by [Metro] ... but whose cases, for various reasons, have not resulted in conviction; whether by dismissal, <u>failure to prosecute</u> ... or whatever other reason...." (Original Docket Entry No. 37 at 1; Docket Entry No. 19, Att. D, at 1) A class member whose arrest has not resulted in conviction because of a failure to prosecute the charge of arrest is a class member, ostensibly protected by the 1974 decree, whose charges have not been finally disposed of.

In any event, the undersigned does not believe that the

16

parties in settlement, and the Court in recognition of same, are
bound by the scope of the litigation as conceived in its early
stages.  Indeed, as cited above, the U.S. Supreme Court has
stated that a consent decree must only "come within the general
scope of the case made by the pleadings[.]"  <u>Frew</u>, 540 U.S. at
437.  Metro cites authority for the proposition that a consent
decree "'must be interpreted in its entirety, considering all
facts and circumstances surrounding its execution, as well as all
pleadings and motions from which it emanates'" (Docket Entry No.
12 at 6 (<i>quoting</i> <u>Elliott v. LRSL Enters., Inc.</u>, 589 N.E.2d 1074,
1077 (Ill. App. Ct. 1992)).  While Metro argues that plaintiffs
seek to expand the reach of the Court's decree, it is clear to
the undersigned that Metro's interpretation of that decree in
fact constricts its scope in a manner at odds with the facts,
circumstances, pleadings, and motions from which it arose.

    To begin with, plaintiff Doe's verified complaint
requested that the Court "[p]ermanently enjoin defendants from
disseminating any information of arrest records to private
individuals unless and until such arrests have resulted in a
criminal trial or conviction, except wherein the arrested person
has specifically authorized such release."  (Original Docket
Entry No. 3, ¶ 30(J); Docket Entry No. 19, Att. E, ¶
30(J))(emphasis added)  On September 10, 1973, before the case
was even certified as a class action, the Court entered the 1973

17

decree, whereby Metro was precluded "from inquiring about, obtaining, or using any information regarding any arrests which have not resulted in a criminal trial or conviction for criminal activities, when considering applicants for employment..." (Original Docket Entry No. 17; Docket Entry No. 19, Att. A)(emphasis added)  This decree set the stage for even broader action by Metro as the litigation progressed.

As noted in Judge Morton's Memorandum entered May 28, 1974 (Original Docket Entry No. 37 at 2), the practice of making available to the public arrest records maintained by Metro of persons arrested but not convicted was terminated on November 21, 1973, with the repeal of § 34-1-11 of the Metro Code.  This repeal was instituted by agreement of the parties in settlement, according to their joint motion to continue the original trial date (Original Docket Entry No. 18; Docket Entry No. 19, Att. G). According to the parties' stipulations (Original Docket Entry No. 34, ¶ 7; Docket Entry No. 19, Att. H, ¶ 7), Metro instituted a policy on the heels of the repeal of § 34-1-11, whereby all arrest records housed by the Central Records Service were available for release to designated law enforcement agencies, but not to any representative of private business or industry.  This policy went further than the repeal of § 34-1-11, inasmuch as it pertained to all arrests, and not merely arrests without conviction.  In their summary judgment memorandum filed March 8,

1974, Metro represented that

> The Metropolitan Government has taken affirmative
> action to prevent the public dissemination of arrest
> records. The Metropolitan Council, in November of
> 1973, repealed Metropolitan Code Section [34-1-11],
> which allowed a person to copy an arrest record for the
> payment of a fee. Further, the Metropolitan Police
> Department has adopted regulations which limit
> dissemination of arrest records to law enforcement
> agencies only. Access by employers or any other member
> of the public or non-law enforcement agencies is
> prohibited.

(Original Docket Entry No. 33 at 5)

It seems clear that, as described in plaintiffs'
summary judgment memorandum filed on March 27, 1974 (Original
Docket Entry No. 36 at 3; Docket Entry No. 19, Att. J, at 3), the
1974 decree was entered into for the purpose of cementing the
policy changes promulgated by the Metro Council and the Metro
Police Department, at least as they related to the records of
individuals arrested but not convicted. Indeed, the police
department's policy statement is expressly incorporated in the
1974 decree. Accordingly, it appears that Metro's present day
construction of the 1974 decree flies in the face of its
representations and policies at the time the decree was entered.
In deference to the contractual element of consent decrees, they
"should be construed to preserve the position for which the
parties bargained." Vogel v. City of Cincinnati, 959 F.2d 594,
598 (6th Cir. 1992)(citing Williams v. Vukovich, 720 F.2d 909,
920 (6th Cir. 1983)). The undersigned must conclude that

19

plaintiffs' construction of the scope of the 1974 decree is in accord with what the record reveals to have been the bargain struck,[3] and is therefore the correct one.

In characterizing plaintiffs' motion to assure compliance, filed in response to the display on Metro's website, as an attempt "to enliven and broaden the scope of a 1974 Consent Decree, [and] not the appropriate method by which to raise novel constitutional arguments never contemplated by the original lawsuit and/or Consent Decree" (Docket Entry No. 12 at 6), Metro ignores the fact that the original lawsuit was prompted by concerns over increased publicity of arrest records with the advent of the computer age. Times have changed, to be sure, but it does not appear that the motion to assure compliance rests on any novel legal theory outside the scope of the 1974 decree.

Finally, regarding the scope of the 1974 decree, it is worth noting here that the injunction against defendants pertains only to what have been described as "raw arrest records." Pursuant to the parties' stipulations, the records at issue are (or were) the single file of materials maintained at the Metro

---

[3]This finding is further supported by the fact that under Metro's interpretation of the decree's language, plaintiffs' "bargain" would have netted protection from disclosure of their arrest records for a mere sixty days at best, since the expunction statute in effect as of July 1, 1973, appears to have mandated the <u>automatic</u> removal and destruction of such records by "[t]he chief administrative official of the municipal, county, or state agency and the clerk of the court where such records are recorded ... within a period of sixty (60) days from the date of final disposition of such charge." (Original Docket Entry No. 37, n.1; Docket Entry No. 19, Att. D, n.1)

20

Central Records Service. (Original Docket Entry No. 34 & Docket
Entry No. 19, Att. H, ¶¶ 3-5) As will be further discussed
infra, it is clear that once the judicial system is involved on
the record of an arrestee's formal charging, all proceedings are
a matter of public record unless the proceedings are sealed, and
any attempt by the courthouse or county clerk to deny public
access to records attending such proceedings would likely be in
violation of the requesting party's First Amendment rights. Of
course, as far as raw arrest data goes, law enforcement would be
the first governmental agency to possess such data and, under the
1974 decree in the absence of conviction, also the last.

Changes, If Any, In Federal Law

Both Metro and the State seek the vacation of the 1974
decree based on what they regard as a significant change in the
law upon which the decree was predicated. Defendants' motions
are made pursuant to Fed.R.Civ.P. 60(b), which provides in
pertinent part as follows:

> On motion and upon such terms as are just, the court
> may relieve a party or a party's legal representative
> from a final judgment, order, or proceeding for the
> following reasons: ... (5) the judgment has been
> satisfied, released, or discharged, or a prior judgment
> upon which it is based has been reversed or otherwise
> vacated, or it is no longer equitable that the judgment
> should have prospective application; or (6) any other
> reason justifying relief from the operation of the
> judgment. The motion shall be made within a reasonable
> time... A motion under this subdivision (b) does not
> affect the finality of a judgment or suspend its
> operation.

21

The terms of this rule allow flexibility in administering consent decrees. Rufo, 502 U.S. at 380. But, as the Rufo Court stated, "Rule 60(b)(5) provides that a party may obtain relief from a court order when 'it is no longer equitable that the judgment should have prospective application,' not when it is no longer convenient to live with the terms of a consent decree." Id. at 383. "A party seeking modification of a consent decree may meet its initial burden by showing [] a significant change either in factual conditions or in law." Id. at 384. If it is a change in either statutory or decisional law that is alleged to support modification, and if the change has rendered one or more of the obligations placed upon the parties impermissible under federal law, the consent decree must be modified. Id. at 388. On the other hand, if the law has changed to make legal what the decree was designed to prevent, modification of the decree may be warranted. Id. Finally, if the federal decisional law upon which the consent decree is premised has merely been clarified, rather than changed, the clarification could be deemed to constitute a change in circumstances (rather than law) which would justify modification of a consent decree, but only if the parties had based their agreement on a misunderstanding of the governing law. Id. at 389-90.

In dealing first with the question of whether any change in law has rendered impermissible defendants' obligation

22

to disseminate arrest records only to law enforcement agencies
for law enforcement purposes, the undersigned would note that
Metro does not argue any such change in federal law.  Metro does
argue that the public interest in access to records under the
Tennessee Public Records Act, Tenn. Code Ann. § 10-7-503, would
be disserved if the consent decree survives under plaintiffs'
interpretation.  Section 10-7-503 mandates that state, county,
and municipal records be open to inspection by the citizens of
Tennessee at all times during business hours, and that "those in
charge of such records shall not refuse such right of inspection
to any citizen, unless otherwise provided by state law."  T.C.A.
§ 10-7-503(a).  Metro further claims that the public has a
specific interest in obtaining information about individuals who
have been arrested prior to the actual disposition of a case.

    This argument for modification of the 1974 decree is
not persuasive, principally because the Tennessee Public Records
Act is a state statute with a directive that has not materially
changed since the 1974 decree was entered.  The state's attorney,
Mr. Alex B. Shipley, Jr., understood that directive and
appreciated its application to law enforcement records prior to
binding the state by his signature on the 1974 decree, as
illustrated by his opinion on behalf of the Attorney General
dated December 18, 1973 (contained in the original paper record
as a loose leaf exhibit).  Furthermore, if the state's entry into

23

the 1974 decree were to not be deemed a knowing compromise and waiver in this specific class of cases of the state's public policies embodied in § 10-7-503, the undersigned would construe the act as analogous to a provision of state law authorizing the keepers of such records to refuse the right of public inspection. Finally, any specific interest of the public in obtaining arrest information prior to the actual disposition of a case, while stymied by the 1974 decree, is vindicated by the constitutionally mandated access to judicial proceedings and certain judicial records.

Nor has there been any change in federal law which would make it constitutionally impermissible to deny the requesting public access to arrest records maintained by Metro or the TBI. The TBI in its reply brief (Docket Entry No. 26)[4] and *The Tennessean* in support of its motion to intervene, assert the well established, qualified First Amendment right of the press

_____

[4]The TBI also cites--as instructive--the common law right of access to public records, as discussed in <u>Nixon v. Warner Communications, Inc.</u>, 435 U.S. 589 (1978). *The Tennessean* does not rely on the right of access derived from federal common law. However, regardless of whether the common law right of access is a viable means of discovering the raw arrest data encompassed by the 1974 decree, or whether that right is preempted by the federal Freedom of Information Act, <u>see</u> <u>Center for Nat'l Security Studies</u>, 331 F.3d at 936-37, the mere fact that such information might be available to the inquiring public in some format through the right procedural vehicle is insufficient to defeat the validity of the 1974 decree, which was entered in vindication of plaintiffs' constitutional rights endangered by the dissemination of raw arrest data to the public at large. <u>Cf.</u> <u>U.S. Dept. of Defense v. Federal Labor Relations Authority</u>, 510 U.S. 487, 500 (1994)("An individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form."). Moreover, it does not appear that the decisional law applying the common law right of access could be viewed to have changed sufficiently to justify modification of the 1974 decree.

and the public to attend criminal judicial proceedings, and by extension their right to access transcripts of such proceedings, including pretrial proceedings. Compare Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 575-77 (1980), with Press-Enterprise Co. v. Superior Court, 464 U.S. 501 (1984), and Press-Enterprise Co. v. Superior Court, 478 U.S. 1 (1986); see Nat'l Broadcasting Co., Inc. v. U.S., 828 F.2d 340, 343-44 (6th Cir. 1987)[5]; see Center for Nat'l Security Studies v. U.S. Dep't of Justice, 331 F.3d 918, 933-36 (D.C. Cir. 2003)(describing the evolution of the First Amendment right of access to government information). However, these attempts to extend such constitutionally mandated access to criminal judicial proceedings, to encompass the right to obtain raw arrest data maintained by the executive agencies of local and state government, do not find any support in the cited caselaw nor in any other decisions disclosed by the undersigned's research. See Center for Nat'l Security Studies, 331 F.3d at 934 ("The narrow First Amendment right of access to information recognized in *Richmond Newspapers* does not extend to non-judicial documents that are not part of a criminal trial..."); LAPD v. United Reporting Publ'g Corp., 528 U.S. 32, 40 (1999)("California could decide not to give out arrestee information at all without violating the First Amendment.")(*citing* Houchins v. KQED, Inc.,

---

[5] But compare id., at 347-352 (Ryan, J., dissenting).

25

438 U.S. 1, 14 (1978)).

Accordingly, the undersigned must conclude that the obligations placed on defendants in the 1974 decree have not been rendered impermissible by any change in federal law.

The parties' main bone of contention is the extent to which there was a change in decisional law which made legal what the 1974 decree was designed to prevent, so as to justify its modification/vacation; or, whether the law upon which that decree was based was merely clarified, but not in such a way as to expose the decree as based on any misunderstanding of the governing law, such that the decree should stand. Defendants argue that the 1974 decree was based upon a line of cases that culminated with <u>Wisconsin v. Constantineau</u>, 400 U.S. 433 (1971). In <u>Constantineau</u>, the Supreme Court considered the constitutionality of a Wisconsin statute which authorized the local chief of police to post a notice declaring that, in view of the effects of Ms. Constantineu's alcohol abuse, local merchants were forbidden from selling or giving liquor to her for one year. The <u>Constantineu</u> Court found as follows:

> Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential. 'Posting' under the Wisconsin Act may to some be merely the mark of illness, to others it is a stigma, an official branding of a person. The label is a degrading one. Under the Wisconsin Act, a resident of Hartford is given no process at all. This appellee was not afforded a chance to defend herself. She may have been the victim of an official's caprice. Only

26

when the whole proceedings leading to the pinning of an
unsavory label on a person are aired can oppressive
results be prevented.

Id. at 437.

However, five years after Constantineau was decided and

two years after the entry of the 1974 decree, the Supreme Court

issued its decision in Paul v. Davis, 424 U.S. 693 (1976). In

Paul, the Supreme Court considered the efforts of local law

enforcement to alert area merchants to possible shoplifters

during the Christmas season by circulating flyers which contained

the names and "mug shot" photographs of individuals identified as

"active shoplifters," one of whom had in fact not been convicted

of his only prior shoplifting charge. When confronted with Mr.

Davis' argument that this action was in violation of his

procedural due process rights under the above-quoted language of

Constantineau, the Supreme Court undertook to clarify the import

of Constantineau and other prior decisions, as follows:

> While we have in a number of our prior cases pointed
> out the frequently drastic effect of the "stigma" which
> may result from defamation by the government in a
> variety of contexts, this line of cases does not
> establish the proposition that reputation alone, apart
> from some more tangible interests such as employment,
> is either "liberty" or "property" by itself sufficient
> to invoke the procedural protection of the Due Process
> Clause. ... We think the correct import of
> [Constantineau] must be derived from an examination of
> the precedents upon which it relied, as well as
> consideration of the other decisions by this Court,
> before and after Constantineau, which bear upon the
> relationship between governmental defamation and the
> guarantees of the Constitution. While not uniform in
> their treatment of the subject, we think that the

27

weight of our decisions establishes no constitutional
doctrine converting every defamation by a public
official into a deprivation of liberty within the
meaning of the Due Process Clause of the Fifth or
Fourteenth Amendment.

Paul, 424 U.S. at 701. After examining this line of cases, the
Court in Paul read the language and outcome in Constantineau as
at least implicitly based on the fact that the loss of a state-
created right to purchase liquor was occasioned by the defamatory
posting in that case. The Paul Court thus harmonized its prior
decisions in Constantineau and other cases with the express
holding in Paul that, without the attendant denial of any right
vouchsafed to the individual by state law, the mere defamatory
publications, however seriously they may have harmed the
individual's reputation, could not deprive him of any liberty or
property interests subject to procedural due process guarantees.
Id. at 711-12.

In the context of this case, the undersigned views the
decision in Paul as something of a wolf in sheep's clothing. But
regardless of whether the Paul Court merely clarified the import
of "the weight of [its] decisions" without implicitly overruling
any of them, as it purported to do, or whether the decision in
Paul effected a significant change in Fourteenth Amendment law,
the undersigned concludes that modification of the 1974 decree is
not warranted.

Paul made clear that (1) mere harm to reputation does

28

not violate any constitutional rights, and (2) there is no constitutional right of privacy in the record of one's arrest. This latter point was reinforced by, *e.g.*, the decision of the Sixth Circuit Court of Appeals in <u>Cline v. Rogers</u>, 87 F.2d 176, 179 (6th Cir. 1996)("[T]his circuit does not recognize a constitutional privacy interest in avoiding disclosure of, *e.g.*, one's criminal record."). However, it does not appear that the 1974 decree is solely based upon any misplaced finding or fear of a deprivation of plaintiffs' right to privacy in their unresolved arrest records. Rather, it is clear that after the retroactive effect of the Tennessee expungement statute was clarified, the focus of the litigation turned to the impact of the dissemination of raw arrest records upon class members' prospects for government employment. With the 1973 decree, the Court and parties proclaimed that information related to arrests which have not resulted in a criminal trial or conviction would not be used by Metro in making hiring decisions, "[i]n recognition that fundamental constitutional rights of liberty and privacy are threatened [thereby]..." While privacy in this context has since been eliminated as a constitutional concern, the parties and Court clearly recognized the potential for harm to constitutionally protected liberty interests ultimately recognized by <u>Paul</u> when government's stigmatizing action is accompanied by the loss of or inability to obtain government

29

employment, and took prophylactic measures with the 1973 decree. As discussed above, it appears that the 1974 decree was executed in furtherance of the objectives of the 1973 decree, as the mechanism by which the broad promises of the earlier decree would be ensured; or at least, it is not apparent that the execution of the 1974 decree (which was entered "in recognition of the constitutional rights of Plaintiff and the class he represents") was in furtherance of an independent, unprotected concern such as privacy violations or pure harm to reputation.

Following the execution of the 1973 decree, it may be that the parties, with the Court's imprimatur, used a sledgehammer to swat a fly by agreeing to restrict dissemination of the covered arrest records to the law enforcement community. However, the Metro Council had taken more sweeping measures by eliminating altogether the public's right to purchase arrest records, which Judge Morton clearly relied upon in making the rulings that he did. Moreover, as the Rufo Court recognized, "to 'save themselves the time, expense, and inevitable risk of litigation,' the [government defendants] could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires (almost any affirmative decree beyond a directive to obey the Constitution necessarily does that), but also more than what a court would have ordered absent the settlement." Rufo,

30

502 U.S. at 389 (*quoting* <u>United States v. Armour & Co.</u>, 402 U.S. 673, 681 (1971)). The undersigned finds that the 1974 decree was at least in part related to the parties' and the Court's ongoing concern with safeguarding the previously enumerated liberty interest of the plaintiff class in access to employment opportunities, unencumbered by public and private employers' ability to obtain records of arrest on charges that are not prosecuted to conviction. Accordingly, the undersigned must conclude that the 1974 decree passes muster as one which springs from and serves to resolve a dispute within the Court's subject-matter jurisdiction; comes within the general scope of the case made by the pleadings; and furthers the objectives of the law upon which the complaint was based. <u>See</u> <u>Frew</u>, 540 U.S. at 437.

Metro further contends that the objectives of the 1974 decree have been satisfied by the enactment of a fair and constitutional expungement procedure in Tennessee. However, as previously noted, the expunction statute was given retroactive effect -- and thus was fair and constitutional -- at the time of its enactment in 1973, prior to the entry of the 1974 decree. Moreover, while timely expunction of arrest records might remove the danger of plaintiffs being stigmatized, it cannot be said that the expunction statute is alone sufficient to resolve the due process concerns inherent in the 1974 decree, as illustrated by the facts which gave rise to these renewed proceedings. In

any event, this Court would be unable to vacate and terminate its jurisdiction over the 1974 decree without first finding not only that the decree's objectives have been achieved, but also that defendants are and have been in compliance with the decree's terms. E.g., Gonzales v. Galvin, 151 F.3d 526, 531 (6th Cir. 1998). Unfortunately, defendants' compliance with the terms of the 1974 decree appears to have been limited to the years immediately following the entry of the decree, if that long. Both Metro and the TBI place the blame with plaintiffs for failing to object to any disclosures of covered arrest information, or otherwise to seek to revisit the 1974 decree during the intervening decades. However, while the lack of any protestations from plaintiffs might serve to mitigate the otherwise untimely filing of defendants' Rule 60 motions, it does not justify these defendants' ignoring contractual and judicially imposed obligations to comply with the terms of the decree. Particularly disturbing is the TBI's statement that: "The Consent decree at issue has been dormant, and largely forgotten, for the last thirty-two years. ... With the passage of time and changes in personnel, institutional memory has faded and the Consent Decree was long forgotten." (Docket Entry No. 26 at 5) With all due respect, regardless of whether or not the 1974 decree was intended to remain in effect in perpetuity, "the passage of time" cannot alone justify the failure to observe

32

contractually and judicially imposed obligations, nor can the order of this Court simply be disregarded as a relic.[6]

Furthermore, Metro's modern-day noncompliance through its internet website postings proves the point that expungement procedures cannot alone ameliorate the potentially unconstitutional effect of premature disclosure of raw arrest data with which the 1974 decree is concerned. The constitutional debate over such "john-shaming" practices rages in cities throughout the country, see, e.g., Tenn. Op. Atty. Gen. No. 01-127, 2001 WL 964173 (opining that "the proposal to televise names and photographs of those convicted of prostitution-related offenses does not appear to endanger any 'liberty' or 'property' right protected under the Due Process Clause. Key to this opinion, however, is the assumption that the names and photographs are those of only *convicted* offenders, rather than those merely arrested. Publication of names and photographs of those arrested, but not convicted, would require further analysis of the accused's pre-trial due process rights."); Tresa Baldas, Posting of 'Johns' on the Web Raises Rights Issue, The National Law Journal, August 1, 2005.[7] While there is a paucity of federal authority on the issues raised by this practice,

---

[6]The undersigned shudders at the thought of what Judge Morton would have made of the TBI's comments.

[7]http://www.law.com/jsp/law/LawArticleFriendly.jsp?id=1122627913185

33

presumably owing to the difficulty of securing a plaintiff willing to publicize the prostitution-related arrest in order to advocate his right not to have it publicized, the undersigned concludes that the arrestees in this jurisdiction are entitled to the benefit of having unwittingly found a representative plaintiff in 1973.

For all of the foregoing reasons, the undersigned finds that the 1974 decree yet lives, and that neither changes in circumstances or in law, nor clarification of law revealing any misunderstanding of governing principles by the parties and the Court, support the requested dissolution or modification; that it has application to the dissemination by Metro and TBI of raw arrest data which they maintain regarding individuals who have been arrested but not convicted of the charge of arrest; and that it has been violated by Metro's postings to its website, at the least. Therefore, the undersigned would recommend that Metro be **ORDERED** to discontinue forthwith its practice of making these and other such postings to its website. The TBI has represented that its disclosures of arrest histories pursuant to the provisions of Tenn. Code Ann. § 38-6-120, upon any individual's request and payment of a $29.00 fee, reveal "the same information that can be found in the public records that are on file in the courthouses in all of the counties in this state." (Docket Entry No. 26 at 1, n.1) Rather than order defendants to engage in the self-study

34

and self-assessment advocated by class counsel in order to determine the extent of their compliance with or violation of the 1974 decree as interpreted in this report, the undersigned would **RECOMMEND** that class counsel be allowed a period of limited discovery of defendants, wherein class counsel may flesh out the practices which he would contend are violative of the 1974 decree, and at the conclusion of which counsel may seek either cessation by agreement of the disputed practices or specific enforcement of the decree provisions.

<u>The Motion to Intervene</u>

*The Tennessean* seeks to intervene in this matter either as a matter of right or, failing that, by permission, citing the provisions of Fed.R.Civ.P. 24. This rule provides for intervention as a matter of right "...when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Fed.R.Civ.P. 24(a)(2). The rule provides for permissive intervention "...when an applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b)(2).

Central to *The Tennessean's* arguments for intervention

35

is its contention that there is a First Amendment right of the press or public to access arrest records.  In fact, the First Amendment protects the "freedom of the media to communicate information once it is obtained," but does not "compel[] the government to provide the media with information or access to it on demand."  Houchins, 438 U.S. at 9.  Also, as discussed above, to the extent that the First Amendment has been construed to require public access to judicial documents, that right of access is to be exercised at the county clerk offices of the state, an exercise which the enforcement of the 1974 decree does not foreclose.  The adjudication of these matters thus will not impair or impede *The Tennessean's* ability to protect its interests in access through the judiciary.  *The Tennessean* misconceives the stakes in this enforcement proceeding when it argues that "[i]n order to grant the Plaintiffs the full relief they seek - confidentiality of the fact of arrest unless and until there is a conviction - it will be necessary to seal judicial records and close all judicial criminal court proceedings." (Docket Entry No. 23 at 4)  Plaintiffs do not seek confidentiality of the fact of arrest unless and until there is a conviction; rather, they sought and secured confidentiality (except as among designated law enforcement agencies) of the raw arrest records maintained by the executive agencies of the local government and, downstream, by the TBI.  The criminal judicial

36

records and proceedings remain as open as ever to *The Tennessean* and its media brethren.

In short, out of concern that *The Tennessean* lacks a significant interest in the subject matter of this enforcement proceeding; that permissive intervention, if allowed, would unduly delay Court action to enforce its prior injunction; that such motions to intervene in this post-judgment, enforcement setting are generally disfavored, and particularly so where the movant had a reason to know before the final judgment that its interests were at risk, e.g., 6 Moore's Federal Practice (3d ed. 2000) § 24.21[2]; and that *The Tennessean* apparently declined to intervene in 1973 when it had the chance to do so in a timely fashion (Docket Entry No. 13 at 1), the undersigned would recommend that the motion to be allowed to intervene as of right or by permission be **DENIED**.


### III. Summary

In light of the foregoing, the Magistrate Judge recommends that plaintiffs' motion to assure compliance be **GRANTED** in part and **DENIED** in part, with allowance for limited discovery by plaintiffs as described herein; that *The Tennesseean's* motion to intervene be **DENIED**; and that defendants' motions to dissolve or vacate the consent decree be **DENIED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 20th day of February, 2007.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

38