**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:73-6971** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| **BEVERLY BRILEY**, *et al.*, | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM</u>**

This case comes before the court on the recommendation of the Magistrate Judge (Docket No. 29) to grant in part and deny in part the Motion to Assure Compliance filed by the plaintiff (Docket No. 2), to which defendant Tennessee Bureau of Investigation and defendant Metropolitan Government of Nashville and Davidson County have responded (Docket Nos. 10, 11), and the plaintiff has replied (Docket Nos. 26; 28). In addition, the court will consider the recommendation of the Magistrate Judge to deny the Motion to Dissolve filed by defendant Tennessee Bureau of Investigation (Docket No. 8), and the Motion to Dissolve filed by defendant Metropolitan Government of Nashville and Davidson County (Docket No. 11), to which the plaintiff responded (Docket Nos. 18; 19), and the defendants replied (Docket Nos. 26; 28). The court will also consider Motions to Dissolve filed by intervenors *The Tennessean* (Docket No. 5, Ex. 1) and NewsChannel 5 Network, L.P. ("NewsChannel 5") (Docket No. 36, Ex. 2). For the reasons cited herein, the plaintiff's Motion to Assure Compliance will be denied, the defendants' Motions to Dissolve will be granted, and the Motions to Dissolve filed by the intervenors will be granted.

1

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises from a consent decree originally entered into by the Metropolitan Government of Nashville and Davidson County ("Metro"), the state of Tennessee, and plaintiff John Doe, individually and on behalf of all others similarly situated, on March 22, 1974.[1] The 1974 consent decree settled a lawsuit filed in the United States District Court for the Middle District of Tennessee, limiting the public's access to arrest records. The 1974 consent decree provides, in relevant part:

> The Metropolitan Government of Nashville defendants, their successors, their agents, their employees and others acting under their supervision or control shall hereinafter limit access to the records of arrest under their control as follows: the arrest records maintained by the Metropolitan Government of Nashville of persons arrested by the Metropolitan Government of Nashville but who are not convicted of the charges upon which the arrest was predicated will be revealed only to law enforcement agencies and only for official law enforcement purposes; . . . . The Metropolitan Government of Nashville defendants and the State of Tennessee defendant, his successors, agents, employees and those under his supervision and control are hereby enjoined from disseminating such arrest records as above described except to such law enforcement agencies for official law enforcement purposes.

(Docket No. 19, Ex. B at ¶ 1) In addition, the 1974 consent decree provides that "[t]his court reserves jurisdiction over this matter to assure compliance with this and any subsequent Order." (*Id*. at ¶ 6)

---

[1] The relevant facts in this case are not in dispute. Unless otherwise noted, the facts have been drawn from the plaintiff's Memorandum in Support of his Motion for Further Relief to Assure Compliance (Docket No. 3); the plaintiff's Responses in Opposition to the defendants' Motions to Dissolve (Docket No. 18; 19); the Tennessee Bureau of Investigation's Memorandum in Support of its Motion to Dissolve (Docket No. 9); the Metropolitan Government of Nashville's Memorandum in Support of its Response to the plaintiff's Motion and its Motion to Dissolve (Docket No. 12); the Tennessee Bureau of Investigation's Response to the plaintiff's Motion (Docket No. 10); the Magistrate's Report and Recommendations (Docket No. 29); and the Memorandum in support of the Objections to the Report and Recommendation filed by *The Tennessean* (Docket No. 31), and by the Metropolitan Government of Nashville (Docket No. 32).

The case also involves, tangentially, an earlier consent decree entered in 1973 in the same litigation as the 1974 consent decree. The 1973 consent decree barred the Metropolitan Government of Nashville "from inquiring about, obtaining, or using any information regarding any arrests which have not resulted in a criminal trial or conviction for criminal activities, when considering applicants for employment with the Metropolitan Government or the Metropolitan Board of Education." (Docket No. 19, Ex. A) That is, the 1973 consent decree related specifically to employment decisions, whereas the 1974 consent decree bars all dissemination of arrest records except "for official law enforcement purposes." (Docket No. 19, Ex. B at ¶ 1)

In 1957, the Tennessee legislature enacted the Tennessee Public Records Act, the current version of which states that, except as provided, "all state, county and municipal records . . . shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law." T.C.A. § 10-7-503(a).

In 2004, the Tennessee legislature enacted T.C.A. § 38-6-120, pursuant to which the Tennessee Bureau of Investigation was to make criminal arrest histories publicly available for the first time for a fee of $29 per name submitted. From 2004 until the present date, the Tennessee Bureau of Investigation has provided criminal arrest histories in this manner.

Starting in July 2005, the Nashville Metro Police Department began posting pictures of alleged patrons of prostitution ("johns"), and other individuals arrested in prostitution stings, on the internet. (Docket No. 3, Ex. 1) On July 17, 2006, the plaintiff filed a Motion to Assure Compliance (Docket No. 2), in light of the Metro Police Department's publication of this information. In the Motion to Assure Compliance, the plaintiffs request the court to (1) restore

Case 3:73-cv-06971   Document 61   Filed 09/28/07   Page 3 of 40 PageID #: 747

this case to its active docket; (2) order Metro and the State of Tennessee to refrain from disseminating and providing general access to arrest records unless and until the arrested persons are convicted of the crime for which they were arrested; and (3) order Metro to dismantle its "john" website "root and branch," cease and desist posting the arrest records and/or photographs of arrested persons who have not been convicted, and limit the dissemination of those records to law enforcement agents for law enforcement purposes. (Docket No. 2 at p. 2-3) In addition, the plaintiff requests that the court issue an order requiring the defendants to perform a "detailed and comprehensive self-study" regarding relevant practices and procedures, determining, specifically, what information is shared with whom under the current practice. (Docket No. 3 at p. 6)

On July 21, 2006, this action was referred to Magistrate Judge Juliet Griffin for case management, for ruling on all nondispositive motions and for recommendation on all dispositive motions. (Docket No. 4) On August 2, 2006, The Tennessee Bureau of Investigation moved to dissolve the 1974 consent decree (Docket No. 8) and on August 3, 2006, the Metropolitan Government of Nashville and Davidson County filed a joint motion to dissolve the 1974 consent decree, concurrent with a response brief (Docket No. 11).

On August 8, 2006, *The Tennessean* moved to intervene for the purpose of opposing the plaintiff's motion to enforce the 1974 consent decree. (Docket No. 5) On August 14, 2006, Magistrate Judge Griffin transferred the case to Magistrate Judge John Bryant. (Docket No. 15) On February 20, 2007, Judge Bryant issued a Report and Recommendation, recommending that the plaintiff's Motion to Assure Compliance be granted in part and denied in part and that *The Tennessean*'s Motion to Intervene be denied. (Docket No. 29) On March 2, 2007, *The*

4

*Tennessean* filed its objections to the Report and Recommendation. (Docket No. 30) On March 8, 2007, NewsChannel 5 Network moved to intervene to protect its alleged First Amendment constitutional rights and statutory rights to access public records. (Docket No. 36) On May 7, 2007, this court entered an order rejecting the Report and Recommendation insofar as it recommended the denial of the Motion to Intervene filed by *The Tennessean* and granting the Motions to Intervene filed by both *The Tennessean* and NewsChannel 5 Network. (Docket No 41). Oral argument was heard on the remaining pending motions on July 11, 2007, and post-argument briefs were filed on August 13, 2007 (Docket No. 59) and September 17, 2007 (Docket No. 60).

## ANALYSIS

### I.      Standard of Review

In 28 U.S.C. § 636, Congress "relieve[d] some of the burden on the federal courts by permitting the assignment of certain district court duties to magistrates." *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001). Section 636(b) creates two different standards of review for magistrates' findings that are challenged in district court. District courts "apply a 'clearly erroneous or contrary to law' standard of review for . . . 'nondispositive' preliminary measures," while, "[c]onversely, 'dispositive motions' . . . such as motions for summary judgment or for the suppression of evidence are governed by the de novo standard." *Id.* (citing *United States v. Raddatz*, 447 U.S. 667, 673 (1980).

Likewise, Rule 72 of the Federal Rules of Civil Procedure provides that district courts should set aside a Magistrate Judge's order regarding non-dispositive matters, to which objection has been timely made, if the order "is clearly erroneous or contrary to law," Fed. R. Civ. P.

5

72(a), while the district courts should review *de novo* any recommendation regarding a dispositive motion to which timely objection is made.  Fed. R. Civ. P. 72(b).

Defendant Metro challenges Magistrate Judge Bryant's recommendation to grant in part the plaintiff's motion to assure compliance and to deny its motion to dissolve the consent decree. In accordance with Rule 72(b) of the Federal Rules of Civil Procedure, the court reviews those recommendations *de novo*.

## II.      Plaintiff's Standing to Enforce the Consent Decree

Because "the core component of standing is an essential element and unchanging part of the case-or-controversy requirement of Article III," standing is a jurisdictional requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In fact, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies," and "the concept of standing is part of this limitation." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 37 (1976) (citing *Flast v. Cohen*, 392 U.S. 83, 95 (1968)).  Accordingly, a plaintiff's standing "is—of course—an issue that may be raised and/or considered at any time." *Fieger v. Ferry*, 471 F.3d 637, 643 (6th Cir. 2006).

In its most recent brief, Metro alleges that the plaintiff lacks standing in this case.  In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975), the Supreme Court recognized that "a well-settled line of authority from this Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it."  Following *Blue Chip Stamps*, the Sixth Circuit has held that "third parties, even intended third-party beneficiaries, lack standing to enforce their

6

interpretations of agreed judgments." *Sanders v. Republic Services of Kentucky LLC*, 113 Fed. Appx. 648, 650 (6th Cir. 2004) (citing *Vogel v. Cincinnati*, 959 F.2d 594, 598 (6th Cir. 1992) ("A consent decree 'is not enforceable . . . by those who are not parties to it . . . .'") (internal citations omitted)); *see also Aiken v. City of Memphis*, 37 F.3d 1155, 1168 (6th Cir. 1994) ("The plain language of *Blue Chip* indicates that even intended third-party beneficiaries of a consent decree lack standing to enforce its terms.").

Under *Blue Chip Stamps*, the plaintiff must have been a party to the consent decree in order to enforce it. The plaintiff was, in fact, a named party. The plaintiff class in the 1974 decree was defined as "those individuals who have been arrested by the Metropolitan Nashville Police Department . . . but whose cases were not brought to a criminal trial, have not resulted in a conviction, or were terminated by a dismissal or no true bill returned by the Grand Jury." (Docket No. 19, Ex. B at ¶ 1) The plaintiff in this action, John N. Doe, was also the named plaintiff in that action. (Docket No. 2 at p.1) ("[P]laintiff as class representative moves this Court to assure compliance with the terms and provisions of [the 1974 consent decree].") Accordingly, the plaintiff has standing. The defendants in this case, who have brought motions to vacate the 1974 consent decree under Rule 60(b), also have standing to challenge the decree inasmuch as Metro and the State of Tennessee were both parties as well.[2]

## III.    Application of Rule 60(b)

Federal courts "have always had the inherent equitable power to modify consent decrees

---

[2]Although intervenors The Tennessean and NewsChannel 5 were not parties to the 1974 consent decree, they have met the requirements of intervention, which are more expansive than the traditional requirements of standing, *Purnell v. City of Akron*, 925 F.2d 941, 948 (6th Cir. 1991), as the court held in its May 7, 2007 Memorandum. (Docket No. 40 at p. 7-9) In short, an intervenor need not have the same standing that would be necessary to initiate a lawsuit. (*Id.*)

imposing ongoing injunctive relief." *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994).

Modification of a consent decree is, however, subject to Rule 60(b) of the Federal Rules of Civil

Procedure, on the basis that, although "[a] consent decree no doubt embodies an agreement of

the parties and thus in some respects is contractual in nature, it also "is an agreement that the

parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is

subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of the

Suffolk County Jail*, 502 U.S. 367, 383-4 (1992) (citing *Railway Employees v. Wright*, 365 U.S.

642, 650-51 (1961). Specifically, the Supreme Court has relied on subsections (5) and (6) of

Rule 60(b) to modify a consent decree. *Id.* Rule 60(b) provides, in relevant part:

> On motion and upon such terms as are just, the court may relieve a party or a party's
> legal representative from a final judgment, order, or proceeding for the following
> reasons: . . . (5) the judgment has been satisfied, released, or discharged, or a prior
> judgment upon which it is based has been reversed or otherwise vacated, or it is no
> longer equitable that the judgment should have prospective application; or (6) any
> other reason justifying relief from the operation of the judgment . . . .

*Id.* (citing Fed. R. Civ. P. 60(b)).

In addressing consent decrees arising from institutional reform litigation, the Supreme

Court has advocated a "flexible modification standard . . . because such decrees 'reach beyond

the parties involved directly in the suit and impact on the public's right to the sound and efficient

operation of its institutions.'" *Rufo*, 502 U.S. at 381 (quoting *Heath v. De Courcy*, 888 F.2d

1105, 1109 (6th Cir. 1989)). This more flexible standard is necessary because "such decrees

often remain in place for extended periods of time [and] the likelihood of significant changes

occurring during the life of the decree is increased." *Id.* Accordingly, a party seeking

modification of a consent decree may prevail upon showing "a significant change in

circumstances" which may be met "by showing . . . a significant change either in factual

8

conditions or in law." *Id.* at 383-4.

### A.    Timeliness of the Application for Modification

The plaintiff objects to the pending motions to dissolve the consent decrees as untimely. The plaintiff argues that the defendants' motions must be analyzed under Rule 60(b)(1) and, therefore, that the motions are subject to the one-year statute of limitations applicable to that section. *U.S. v. Krilich*, 152 F. Supp. 2d 983, 991-92 (N.D. Ill. 2001). To the contrary, however, the Supreme Court has directed that modification of consent decrees should be analyzed under Rule 60(b)(5), which does not include a one-year time limitation. *Rufo*, 502 U.S. at 381. Instead, under that subsection, a motion to modify or dissolve need only be "made within a reasonable time." *Id.*

In *Rufo*, 502 U.S. at 383, a case involving the modification of a consent decree arising from earlier prison reform litigation, the Court abandoned a stricter modification standard outlined in *United States v. Swift & Co*, 286 U.S. 106, 119 (1932), and held that, under Rule 60(b)(5), "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstance warrants revision of the decree."  Nowhere in *Rufo* did the Supreme Court indicate that parties seeking modification of consent decrees are subject to the one-year statute of limitations under Rule 60(b)(1).  In fact, the Supreme Court and the Sixth Circuit have continued to apply Rule 60(b)(5) when determining whether to modify consent decrees. *See, e.g., Agostini v. Felton et al.*, 521 U.S. 203, 209 (1997) ("[P]etitioners are entitled under Federal Rule of Civil Procedure 60(b)(5) to relief from the operation of the District Court's prospective injunction."); *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville & Davidson County*, 466 F.3d 391, 394-95 (6th Cir. 2006) (applying Rule 60(b)(5) in a

9

modification of consent decree case).

The plaintiff, nevertheless, cites several cases involving private parties and not relating to prospective relief, where courts applied Rule 60(b)(1) and its attendant one-year statute of limitations. These cases are inapposite. For instance, *Abu-Ali Abdur'Rahman v. Bell*, 493 F.3d 738, 740-41 (2007), involved an inmate's post-judgment motion to review a failed *habeas* petition, based on a subsequent clarification of the law. The plaintiff makes extensive use of the court's finding in *Abdur-Rahman* that the intervening regulation "only *clarified* the law, and did not *change* the law" and, therefore, "the district court committed a legal error" which falls under the purview of Rule 60(b)(1). *Id.* at 741 (emphasis in original). However, even if the court were to find that the case at hand involves a clarification of law, and not a change in law, the distinction made by the *Abdur-Rahman* court would not apply. That is because the Supreme Court and the Sixth Circuit have consistently found that Rule 60(b)(5) is the applicable provision for modification of a consent decree, regardless of whether the case involves a change in law, clarification of law, or a change in factual circumstance. *See Rufo*, 502 U.S. at 383-86; *Deja Vu of Nashville, Inc.*, 466 F.3d at 394-95.

In *Rufo*, the Supreme Court did not distinguish between the various avenues for modifying consent decrees, but instead established a rule for all cases where a party seeks to modify the prospective application of such decrees. *Rufo*, 502 U.S. at 383-86. Moreover, the language of Rule 60(b)(5) is uniquely applicable to court judgments issuing prospective relief. Fed. R. Civ. P. 60(b)(5) ("[T]he court may relieve a party . . . from a[n] . . . order [when] it is no longer equitable that the judgment should have prospective application.") In this light, *Abdur-Rahman*, which did not involve prospective relief in any form, much less an institutional consent

10

decree, appears very far removed from the situation at hand.  *See Rufo,* 502 U.S. at 380

("Because such decrees often remain in place for extended periods of time, the likelihood of

significant changes occurring during the life of the decree is increased."); *Kalamazoo River*

*Study Group v. Rockwell Int'l Corp.*, 355 F.3d 574, 587 (6th Cir. 2004) ("Most cases consider

Rule 60(b)(5)'s 'prospective application' clause in the context of consent decrees, which are

prospective by nature."); *Lorain NAACP v. Lorain Board of Education*, 979 F.2d 1141, 1148

(applying *Rufo*'s "less stringent modification standard" in the prison reform context).

     The plaintiff cites a rule established by the Sixth Circuit that Rule 60(b)(6)'s broad catch-

all allowance for modification under "any other reason justifying relief" should not be applied

where the request falls under one of the other, more narrow, subsections of Rule 60(b).  *See*

*Pierce v. United Mine Workers of America Welfare and Retirement Fund*, 770 F.2d 449, 451 (6th

Cir. 1985) ("[A] claim of simple legal error, unaccompanied by extraordinary or exceptional

circumstances, is not cognizable under Rule 60(b)(6).").  This rule does not, however, mandate

application of Rule 60(b)(1) in this case.  First, as established in *Rufo* and its copious progeny,

Rule 60(b)(5), which relates to prospective relief, is the particular narrow subsection most

applicable to modification of consent decrees.  *See, e.g., Lorain NAACP*, 979 F.2d at 1148.

Therefore, assuming that the court is barred from utilizing subsection (b)(6) in all cases "which

are not covered under the first five subsections," *Pierce*, 770 F.2d at 451, it would remain the

fact that subsection (b)(5), and its less stringent timing requirement, is available.

     Second, courts have not held that Rule 60(b)(6) can never be applied in cases where

narrower subsections, such as Rule 60(b)(1), also apply.  Instead, even where the moving party

has raised a "claim of strictly legal error" falling under the "category of 'mistake'" under Rule

60(b)(1), "courts may employ subsection (b)(6) as a means to achieve substantial justice when 'something more' than one of the grounds contained in Rule 60(b)'s first five clauses is present." *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989). Because the Supreme Court has noted that, for many reasons, modification of a consent decree involves significant interests that are absent in ordinary Rule 60(b) motions, *see Rufo*, 502 U.S. at 381 ("[T]he public interest is a particularly significant reason for applying a flexible modification standard in institutional reform cases because such decrees 'reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions.'") (quoting *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)), there exists a strong argument that Rule 60(b)(6) applies to consent decrees in addition to Rule 60(b)(5). In light of the public interests identified by the Supreme Court and the Sixth Circuit, this court would be quite remiss in applying a one-year statute of limitations on the assumption that this case did not meet the "something more" standard.

There is simply no cognizable reason, under this line of cases, for the court to accede to the plaintiff's continued insistence that the parties to the 1974 decree are subject to a one-year statute of limitations. No opinion cited by the plaintiff or discovered by this court lends weight to that assertion.

As to what constitutes a "reasonable time," the plaintiff has cited cases holding that all such motions "must be filed promptly, and any delay in filing the motion must be justified by a valid excuse." *First Republic Bank v. Norglass, Inc.*, 958 F.2d 117, 121 (5th Cir. 1992); *see also SEC v. Worthen*, 98 F.3d 480, 482 (9th Cir. 1996) (requiring that Rule 60(b) motions be "made within a reasonable time" and the movant to provide "an explanation as to why" it did not seek

12

relief earlier).  However, the defendants have cited additional case law holding that, under Rule 60(b)(6) "[t]he determination as to what sorts of neglect will be considered 'excusable' is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission."  *Pioneer Inv. Serv. Co. v. Brunswick Assocs. P'ship*, 507 U.S. 380, 393-4 (1993).

The "reasonable time" requirement has been applied considerably more flexibly—when it has been applied at all—in institutional reform cases.  *See, e.g., Sweeton*, 27 F.3d at 1164.  There is good reason for this.  Private parties can be expected to move in a timely fashion to modify or vacate orders whenever a change in circumstance arises.  Municipal entities, such as the Tennessee Bureau of Investigation, however, do not have perfect institutional memory, and where a consent decree has gone unenforced for many years, the individuals who administer those entities may not have any knowledge of its existence.  *See Shakman v. City of Chicago*, 426 F.3d 925, 933-34 (7th Cir. 2005) (holding that the district court had abused its discretion in failing to consider the "public nature of the litigation" in finding that the city's motion to amend did not meet Rule 60(b)'s timing requirement).

Moreover, consent decrees, unlike other judgments, uniquely implicate the public interest.  By entering into a consent decree, individuals who, at the time, control government institutions are able to bind those institutions to refrain from, or to engage in, certain policies.  These individuals will come and go, and the policies may gain or lose favor within the institutions and with the public at large, and yet the consent decree retains the force of a judicial order.  Therefore, it is of the utmost importance that, where the circumstances underlying the agreement change or where—such as in this case—the legal rights underpinning the agreement are eroded, the parties may be permitted to come before the court and modify the agreement.  If

13

the mere passage of time should block these parties from modifying their agreements then, so long as a consent decree has gone unchallenged for a good many years, it may be set in stone. That would be a perverse and undemocratic state of affairs. Municipal institutions change shape over time and their goals and policies shift; similarly the circumstances surrounding consent decrees shift and, on occasion, the Supreme Court finds that a right citizens had once counted on was never really there. We may celebrate or bemoan these changes, but a consent decree will not hold them back. Where circumstance or law has changed, the parties must be permitted to amend consent decrees.

It may be for these reasons that, when the Sixth Circuit Court of Appeals has addressed the propriety of modifying long-standing consent decrees, it often has not even addressed the issue of timeliness. *Sweeton*, 27 F.3d at 1166. Instead, the Sixth Circuit has focused on the majoritarian interests outlined above, reasoning:

> Ongoing injunctions should be dissolved when they no longer meet the requirements of equity. The law changes and clarifies itself over time. Neither the doctrines of *res judicata* or waiver nor a proper respect for previously entered judgments requires that old injunctions remain in effect when the old law on which they were based has changed.

*Id*. at 1166-67. *Sweeton* is particularly relevant to the case at hand. In that case, the Sixth Circuit faced challenges to a consent decree mandating parole procedures which the Supreme Court had determined—ten years earlier—not to implicate federal due process interests. *Id*. at 1164. Finding that the "decisional law has changed so that the enjoined behavior, which once *might* have been a violation of federal law, is no longer a matter of federal law at all," the Sixth Circuit remanded the case to the district court to vacate the consent decree and to dissolve the injunctions imposed by it. *Id*.; *see also Evans v. City of Chicago*, 10 F.3d

14

474, 475 (7th Cir. 1993) (holding that a district court cannot "require a unit of state or local government to abide by a consent decree that does not serve any federal interest"); *Shakman*, 426 F.3d at 934 ("Institutional reform litigation, and consent decrees attendant to that litigation, involve considerations of public interest and federalism that are not present in the run-of-the-mill civil case.").

Nevertheless, the parties are bound by Rule 60(b)(5) to provide some explanation as to the timing of their motions. *Rufo*, 502 U.S. at 378 ("There is no suggestion in these cases that a consent decree is not subject to Rule 60(b).") More specifically, Rule 60(b)(5) requires the moving parties to show that the proposed modification of the consent decree was made within "a reasonable time." In evaluating each of the moving parties' efforts, the court will keep in mind the flexibility espoused by the Supreme Court in *Rufo* and by the Sixth Circuit in *Sweeton*. In particular, the equitable factors of relative harm to the parties and to the public interest weigh strongly in favor of reexamining the consent decree in this case.

### 1. The Tennessee Bureau of Investigation

TBI concedes that approximately thirty years have passed between the issuance of the consent decree and the filing of its motion for relief. However, TBI argues that its delay was excusable because public disclosure of arrest records was not an issue for TBI until 2004, when TCA § 38-6-120 was enacted. TCA § 38-6-120, passed roughly thirty years after the 1974 consent decree, required TBI to disclose Tennessee criminal arrest histories to the public. Due to this lapse of time, TBI alleges that its institutional memory "faded": there were no employees remaining with TBI who knew that complying with the new law would necessarily entail violating the earlier consent decree. Accordingly, TBI complied with TCA § 38-6-120 until the

15

consent decree was brought to its attention by the present litigation.

Although mistake of law is not a defense to a criminal prosecution, the court finds that TBI's ignorance of the consent decree, due to both the passage of time and the passage of contradictory legislation, does weigh in favor of a finding that TBI acted within a "reasonable time." Other equitable factors that weigh in favor of this finding are the relative harm to the parties and to the public interest. TBI points out, rightly, that delay in seeking relief from the decree has not caused any harm to the plaintiffs. However, the delay has not, as TBI suggests, permitted the plaintiffs to derive "the benefit of legal protection for a right that has not existed in the Sixth Circuit for the past thirty years." In fact, the plaintiffs have derived no legal benefit from this non-existent right because the Tennessee legislature has passed legislation which stands in opposition to the consent decree, and TBI has acted in accordance with that legislation. Had TBI moved for relief earlier, the plaintiffs would not have been in any worse a position, but neither would they have been in any better a position.

In addition, as discussed above, the public interest weighs heavily in favor of revisiting a consent decree when the federal right underpinning the consent decree appears to have eroded. The public interest in clarity of the law would also have weighed in favor of TBI's moving for relief many years ago when the right first did erode. But that time has passed. Although the public interest would have been better served for TBI and the other defendants to have moved to modify the consent decree at a much earlier time, it is best served at this point in time by allowing the parties to reexamine the consent decree. The public has an interest in the enforcement of legislation that has been passed by its representatives and, where no constitutional interest exists contravening that interest, it must prevail. Accordingly, the court

finds that TBI's application to modify the consent decree was timely.

## 2. The Metropolitan Government of Tennessee

Metro argues that it was its sincere belief for the past thirty years—and remains its sincere belief—that the plain language of the 1974 consent decree does not bar public disclosure of all unresolved criminal charges, but only those criminal charges that have been resolved but resulted in something other than conviction. As will be discussed below, the court does not agree with Metro's interpretation of the 1974 consent decree. However, the court has found no reason to doubt Metro's sincerity in its interpretation of the consent decree's language. Soon after Metro's interpretation was challenged in the present litigation, Metro moved to dissolve the consent decree. Therefore, similar to TBI's delay, Metro's delay in moving to modify or dissolve the 1974 consent decree is due, in part, to confusion—shared by many of the parties in this case—as to what legally protected interests actually exist in this case. In addition, the equitable factors of prejudice to the parties and to the public interest weigh equally in favor of Metro's motion to dissolve the consent decree and TBI's motion. Accordingly, the court finds that, for purposes of Rule 60(b), Metro's motion to dissolve was timely.[3]

---

[3]In addition, Metro argues that its Rule 60(b) motion cannot be denied as untimely because it is really a challenge to the court's subject matter jurisdiction to enter the consent decree in the first place. The court does not find this argument persuasive. In his concurrence in *Sweeton*, 27 F.3d at 1167, Senior Circuit Judge Conte suggested that, where subsequent legal authority indicated that the enjoined behavior did not violate federal law, the case "may also be dismissed for lack of subject matter jurisdiction," because it does not involve a federal question. However, the test for federal subject matter jurisdiction is not whether the plaintiff's proposed federal interest will ultimately prevail, but whether "the complaint is drawn so as to seek recovery directly under the Constitution or laws of the United States, unless the federal claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.'" *Id*. at 1173 (Jones, J., dissenting) (quoting *Bell v. Hood*, 327 U.S. 678, 682-83); *see also Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1988) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*,

17

### 3.    *The Tennessean* and NewsChannel 5

Neither *The Tennessean* or NewsChannel 5 were parties to the 1974 consent decree. Considering the number of years that the 1974 consent decree went both unchallenged and unenforced, and considering both *The Tennesseean*'s and NewsChannel 5's long-standing access to criminal arrest records, the court finds that any delay on behalf of either of these parties is reasonable. Both parties' motions were filed within a reasonable time of their learning about this controversy. Accordingly, the court will address the intervenors' constitutionality challenges as timely brought under Rule 60(b).

### B.    The Plaintiff's "Continuous Violation" Argument

The plaintiff argues that any modification of the consent decree should be barred pursuant to the "continuous violation" doctrine. Under that doctrine, a defendant to a contempt proceeding may not challenge the validity of the underlying injunction as a defense to violating that injunction. *Walker v. City of Birmingham*, 388 U.S. 307, 318-19 (1967). Or, more simply, parties have a duty to comply with an ongoing injunction until it is dissolved. To illustrate, if the plaintiff had brought a contempt action against the defendants, focusing on retrospective, instead

---

the court's statutory or constitutional *power* to adjudicate the case."); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 70 (1978) ("For purposes of determining whether jurisdiction exists under § 1331(a) . . . . the test is whether 'the cause of action is *so patently without merit* as to justify the court's dismissal without jurisdiction.'") (quoting *Hagans v. Lavine*, 415 U.S. 528, 542-43 (1974)).

In 1974, when the consent decree was entered, and in 2005, when the present enforcement action was filed, the *Bell v. Hood* requirements were satisfied. As will be discussed below, in 1974, it was far from clear that a Constitutional right did not protect the information at issue in this case. Although the Constitutional law appears to have shifted before the institution of the present action, the very existence of the federal consent decree which purports to protect the information at issue in this case is enough to show that the plaintiff's claim is not "wholly insubstantial and frivolous." *See Steel Co.*, 523 U.S. at 90 (holding that it was "fanciful to think" that the Court had revised its jurisprudence that "the failure of a cause of action does not automatically produce a failure of jurisdiction").

of prospective, relief, the "continuous violation" doctrine would have defeated any defense that focused solely on the validity of the underlying injunction. *See, e.g., Kindred v. Duckworth*, 9 F.3d 638, (7th Cir. 1993) (holding that the implementation of a policy that violated a consent decree could give rise to contempt proceedings).

But the plaintiff has not brought a contempt action against the defendants, and he seeks only prospective relief.[4] The "continuous violation" doctrine is simply not relevant in this limited context. The doctrine cannot be used to prop-up an otherwise legally deficient injunction in perpetuity. Instead, when the plaintiff seeks only to sustain the operation of an injunction, the validity of that injunction is very relevant, and it most certainly is a defense.[5] Whether the defendants had a duty to comply with the consent decree between 1974 and the filing of the plaintiff's motion is not at issue in this case; rather, the plaintiff's motion focuses on what the parties to the consent decree should be barred from doing in the future. Therefore, the court

---

[4]Although the plaintiff, in his most recent brief, states that both the State of Tennessee and Metro are "in contempt and should now be so found" (Docket No. 60 at p. 2), the plaintiff's pleadings do not allege contempt, and the plaintiff does not request relief consistent with a finding of contempt. Instead, the plaintiff raises the specter of contempt in the hopes of gaining "further factual development" through discovery which, presumably, would result in the continued prospective application of the 1974 decree. In light of the fact that the plaintiff has not amended his pleadings to actually allege contempt against anyone, the court finds the plaintiff's saber-rattling less than convincing. Certainly the court cannot grant discovery in favor of causes of action that have not been included in formal pleadings.

[5]The plaintiff cites *Frew v. Hawkins*, 540 U.S. 431, 440 (2004), for the proposition that "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." *Frew* dealt with the argument, raised by state defendants in that case, that the Eleventh Amendment barred the federal courts from enforcing consent decrees against state officials, and says nothing regarding the plaintiff's attempt to forestall inquiry into modification of a consent decree based on prior instances of noncompliance. *Id*. In fact, the Court in *Frew* noted, in support of its finding that enforcement of consent decrees would not "undermine the sovereign interests and accountability of state governments," that "Rule 60(b)(5) allows a party to move for relief if 'it is no longer equitable that the judgment should have prospective application.'" *Id*. at 441.

19

cannot sidestep an inquiry into the underlying merits of the injunction by means of the continuous violation doctrine. *See United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) ("[A] continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.")

> As the plaintiff points out:
>
> Rule 60(b)(5) provides a vehicle for securing relief from "prospective application" of a judgment when such prospective application is "no longer equitable." It does not and is not intended to excuse previous non-compliance with an outstanding injunction.

(Docket No. 52 at p. 8) The plaintiff is right here: the defendants' Rule 60(b) motions do not excuse outstanding non-compliance. However, the plaintiff has not sought damages for non-compliance, but instead seeks prospective application of the 1974 consent decree. It is, therefore, entirely appropriate for the defendants to have raised arguments under Rule 60(b) that such application is no longer equitable and for the court to rule on those motions.

The plaintiff argues that a Rule 60(b) motion is its "own thing and must proceed along [its] own path." (Docket No. 21, Ex. 1 at p. 7) However, modification and vacation of consent decrees often arise alongside enforcement actions. *See, Sweeton*, 27 F.3d 1162, 1164 ("[A] court has continuing jurisdiction to terminate or modify an injunction and . . . an equitable remedy should be enforced only as long as the equities of the case require.") Accordingly, the court will proceed to determine whether relief should be granted under Rule 60(b).

## IV.     Interpretation of the Consent Decree

Finally, the court turns to the 1974 consent decree itself. Defendant Metro asserts, as an alternative to modifying the consent decree, that it is in compliance with the decree because the decree does not actually bar the parties from publishing the arrest records of individuals with

pending criminal charges. Instead, Metro argues, the decree only bars them from publishing the arrest records of individuals whose charges have been disposed of without a conviction, such as where the individual was found not guilty or the charges were not prosecuted at all. In addition, Metro has raised the argument that the consent decree should not be applied to anyone who was arrested after 1973. The court is not convinced by these interpretations and finds, instead, that the 1974 consent decree bars dissemination of arrest records of all persons who have not yet been convicted.

> **A.   Whether the 1974 Consent Decree Applies to All Persons Who Have Not Yet Been Convicted**

The 1974 consent decree provides that "arrest records . . . of persons arrested by the Metropolitan Government of Nashville *but who are not convicted* of the charges . . . will be revealed only to law enforcement agencies and only for official law enforcement purposes." (Docket No. 19, Ex. B at ¶ 1) (emphasis added) By itself, the language could conceivably refer either to all persons who have been arrested but have not yet been convicted—including those whose charges are pending—or it could refer only to those whose charges have been disposed of without a conviction. As Magistrate Judge Bryant pointed out in the Report and Recommendation, although "the decree does not say that it applies to persons who 'are not yet convicted' neither does it say that it applies to persons who 'were not convicted' or 'are not ever convicted.'" (Docket No. 29 at p. 14) Instead, the consent decree uses a single broad term that conceptually could include all of those categories. However, because Metro's interpretation is also a valid one, the court finds that the language is ambiguous.

Examination of the pleadings filed in the litigation leading up to the 1974 decree and the circumstances of that litigation weigh heavily in favor of the first interpretation, adopted by

21

Magistrate Judge Bryant. Plaintiff Doe's original verified complaint requested, as relief, that the court "[p]ermanently enjoin defendants from disseminating any information of arrest records to private individuals unless and until such arrests have resulted in a criminal trial or conviction, except wherein the arrested person has specifically authorized such release." (Original Docket No. 3, ¶ 30(J); Docket No. 29 at p. 17). This language indicates that the plaintiff, at least, conceived of the issue in terms of all arrest records not yet leading to a conviction and did not draw distinctions between those whose charges were pending and those whose charges had been disposed of.

Subsequently, the court certified a class defined to include "those individuals who have been arrested by the Metropolitan Nashville Police Department . . . but whose cases were not brought to a criminal trial, have not resulted in a conviction, or were terminated by a dismissal or no true bill returned by the Grand Jury." (Docket No. 19, Ex. B at ¶ 1) The separate iteration of "have not resulted in a conviction" in this setting would seem to include situations where the accused person is simply awaiting trial; those persons whose cases had already been disposed of would all fall into either the first or third categories. Judge Morton's Memorandum in the 1974 litigation seems to prove this point: "Plaintiff represents the class of persons who have been arrested . . . but whose cases, for various reasons, have not resulted in conviction; *whether by dismissal, failure to prosecute . . . or whatever other reason*." (Original Docket No. 37 at p. 1; Docket No. 16 at p. 29) (emphasis added).

Moreover, in conjunction with the 1973 and 1974 consent decrees, the parties instituted a repeal of § 34-1-11 of the Metro Code, pursuant to which Metro had made available to the public arrest records maintained by the Central Records Service. Upon this repeal and the institution of

22

new policies, the records were made available only to designated law enforcement agencies. The policies applied to all arrest records and did not distinguish between arrestees whose charges had been disposed of and those whose charges were still pending. Accordingly, at the time the parties entered into the consent decree, it cannot have been a surprise to Metro that the language of the 1974 consent decree could be interpreted to bar the dissemination of such records: Metro had instituted that very same policy pursuant to repealing § 34-1-11.

The court agrees with Magistrate Judge Bryant in this regard, and finds that the 1974 consent decree barred the dissemination of arrest records concerning all persons who had not been convicted, including both persons whose charges had been disposed of and those whose charges were still pending.

### B. Whether the Consent Decree Applies to Individuals Arrested After 1973

In its most recent brief, Metro appears to advance the position that the 1974 consent decree can only be applied to the individual plaintiffs who filed suit in that litigation. (Docket No. 59 at p. 2). This position is belied by the language of the 1974 decree and the circumstances surrounding that decree.

As Metro points out, the court defined the scope of the class in the litigation leading up to the 1973 and 1974 decrees as "those individuals who have been arrested by the Metropolitan Nashville Police Department on state charges . . . but whose cases were not brought to criminal trial, have not resulted in a conviction, or were terminated by a dismissal or no true bill returned by the Grand Jury." (Original Docket No. 16) This does not, however, lead to the conclusion that the consent decrees issued as a result of the litigation were limited to persons who had already been arrested at that time.

23

The use of the past tense in the court's order granting class certification does not say anything about the prospective applications of the consent decrees that arose from the litigation. It is important to distinguish the question of whether individuals have standing to enforce the 1974 consent decree—which requires that individual to have been a party to that judgment—from the question of whether the decree protects the individual's arrest information. The terms of the class certification order govern as to who has standing to enforce a consent decree, but they do not limit who can benefit from it. *See, e.g., Blue Chip Stamps*, 421 U.S. at 749 (anticipating the possibility of third-party beneficiaries of consent decrees who were not, themselves, parties to the decrees).

As discussed above, not all beneficiaries to consent decrees are class members, and although individuals who were not arrested prior to the entry of the court's order granting class certification may not have standing to enforce the consent decree, *id.*, that does not entail that they cannot benefit from the consent decree. In short, there is no rule limiting the class of people who may fall under the purview of a consent decree to the class of people who signed the decree. The language "individuals who have been arrested" may have set forth a requirement for class membership, but it does not limit the scope of the resultant consent decrees.

In fact, examination of the 1974 consent decree itself leaves no question as to its prospective application. The 1974 decree provides that "the arrest records maintained by the Metropolitan Government of Nashville *of persons arrested* by the Metropolitan Government of Nashville but who are not convicted of the charges upon which the arrest was predicated *will be revealed* only to law enforcement agencies and only for official law enforcement purposes." (Docket No. Docket No. 19, Ex. B at ¶ 1) (emphasis added) The 1974 decree does not limit

24

itself to persons who were arrested at the time the litigation was initiated, the class was certified, or the decree itself was entered, but instead includes "the arrest records . . . of persons arrested." (*Id.*)  The clear import of this language is that arrest information for all *persons arrested* will be so limited going forward.  Further, the 1974 consent decree includes no cut-off date.  There is simply no basis for interpreting the language of the 1974 decree as limiting its application to those who were arrested in 1973.

Similarly, the 1973 consent decree—which arose out of the same litigation as the 1974 consent decree—provides that "the Metropolitan Government of Nashville and Davidson County Tennessee will *henceforth* refrain from inquiring about, obtaining, or using any information regarding *any arrests* which have not resulted in a criminal trial or conviction for criminal activities when considering applicants for employment . . . at the present *or in the future*." (Docket No. 19, Ex. A) (emphasis added)  If the 1974 decree were ambiguous as to its prospective application—which it is not—the 1973 decree would provide convincing evidence that the court's use of the past tense in its order certifying the class did not foreclose the court from entering judgment in favor of persons who had not yet been arrested.  Nothing in these consent decrees or in the order certifying the class restricted the scope of the litigation to individuals who had already been arrested at the time the lawsuit was filed.

In addition, the plaintiff has produced substantial documentation of the court's and the parties' intentions that the 1973 and 1974 consent decrees were to be applied prospectively.  For instance, as noted above, the original complaint in this action sought to "[p]ermanently enjoin defendants . . . from asking about, obtaining, or using any information regarding arrests which have not resulted in a criminal trial or conviction, when considering applicants for employment."

(Docket No. 19, Att. E at 8)  Further, in a joint motion filed in the original action, Metro agreed

that "[t]he parties propose to agree that in the future arrest records will not be available for

public inspection."  (Docket No. 19, Ex.8)  Finally, in Metro's brief in support of its summary

judgment motion, filed in March 1974, it stated that it had "taken affirmative action to prevent

the public dissemination of arrest records," which action included "limit[ing] dissemination of

arrest records to law enforcement agencies only."  (Docket No. 19, Ex. C at p. 5) Earlier in that

brief, Metro stated that "[a]s the stipulations reflect, the Metropolitan Government no longer

disseminates arrest information to the public."  (*Id*. at 4)

Accordingly, the court finds that the language of the 1974 decree itself, as well as the

circumstances surrounding the decree, demonstrate very clearly that the decree was meant to be

applied prospectively, to all individuals who have been arrested for a crime and not yet convicted

of that crime.

## V.      Modifying the Consent Decree

Next, the court turns to whether the defendants have shown sufficient cause for

modifying the consent decree.  In *Rufo*, 502 U.S. at 384, the Supreme Court held that "[a] party

seeking modification of a consent decree may meet its initial burden by showing either a

significant change either in factual conditions or in law."  With regard to changes in law,

"modification of a consent decree may be warranted when the statutory or decisional law has

changed to make legal what the decree was designed to prevent."  *Id*. at 388.  In addition, "a

decision that clarifies the law . . . could constitute a change in circumstances that would support

modification if the parties had based their agreement on a misunderstanding of the governing

law." *Id*. at 390.[6]

### A. Modification Due to Change of Law

The 1974 consent decree issued shortly after the Supreme Court's decision in *Wisconsin v. Constantineau*, 400 U.S. 433, 438 (1971). In *Constantineau*, the Supreme Court held that a Wisconsin statute whereby the plaintiff's name was posted in retail liquor outlets as a person to whom liquor should not be served was an unconstitutional deprivation of due process under the 14th Amendment. The Court reasoned that, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id*. at 437. The *Constantineau* decision focused not on the economical deprivation at issue, but instead on the stigmatizing effect of the posting:

> 'Posting' under the Wisconsin Act may to some be merely the mark of illness, to others it is a stigma, an official branding of a person. The label is a degrading one. Under the Wisconsin Act, a resident of Hartford is given no process at all. This appellee was not afforded a chance to defend herself. She may have been the victim of an official's caprice. Only when the whole proceeding leading to the pinning of an unsavory label on a person are aired can oppressive results be prevented.

*Id*.

---

[6]The plaintiff has sought to find within *Rufo* an extra requirement that a movant "'satisfy a heavy burden to convince a court that it agreed to the decree in good faith [and] made a reasonable effort to comply with the decree.'" (Docket No. 52 at p. 14) (quoting *Rufo*, 502 U.S. at 385). The full sentence from which this quotation comes reads: "If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Rufo*, 502 U.S. at 385. This extra "good faith" showing—anticipated by the Supreme Court in *dicta*—would apply only "where a party relies upon events that actually were anticipated at the time it entered into a decree" and not in all situations. *Id*. The plaintiff has not argued that the defendants anticipated changing conditions that would make performance more onerous, and the defendants do not raise any "onerous performance" defense, but instead rely on a change in law. The incomplete quotation from *Rufo* has no application here.

Five years later, the Supreme Court took a somewhat different stance.  In *Paul v. Davis*, 424 U.S. 693, 706-10 (1976), the Court held that an ordinance whereby flyers captioned "Active Shoplifters" and featuring the names and faces of purported shoplifters were posted in various retail outlets did not violate the Due Process clause of the 14th Amendment.  Instead, the Court held that there existed no constitutional right of privacy from stigma and public humiliation.  *Id*. The Court maintained that it had "never held that mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment."  *Id*. at 706.

In *Paul v. Davis*, the Court did acknowledge that "[t]here is undoubtedly language in *Constantineau* which is sufficiently ambiguous to justify" the Courts of Appeals' reliance on the decision in finding that such a right did exist.  *Id*. at 708.  However, the Court found that it should "not read this language as significantly broadening . . . [earlier] holdings," while there remained a narrower possible interpretation.  *Id*.  And there was one.  The *Constantineau* decision had involved the deprivation of an economic right: "the right to purchase or obtain liquor in common with the rest of the citizenry."  *Id*.  Stigma, although it "was doubtless an important factor in evaluating the extent of harm," could not, "standing alone" have deprived Constantineau "of any 'liberty' protected by the procedural guarantees of the Fourteenth Amendment."  *Id*. at 709.  Defamation, in of itself, did not implicate the Due Process Clause and, instead, defamatory remarks had to come "in the course of" the deprivation of an economic right in order to be protected.  *Id*. at 710; *see also Ferencz v. Hairston*, 119 F. 3d 1244, 1249 (6th Cir. 1997) ("As with the plaintiff Davis in *Paul*, the interest in reputation alone which the plaintiffs in this case seek to vindicate is 'quite different' from the liberty interest that the Due Process

Clause protects.")

Determining whether a subsequent decision constitutes a change in law, or a clarification of law—about which, in hindsight, many jurists were mistaken—is sometimes a tricky proposition. Certainly, the dissenters in *Paul v. Davis* considered the case to be a substantial departure from *Constantineau* and from a significant body of precedent. *Id.* at 1167 (Brennan, J., dissenting) ("The result, which is demonstrably inconsistent with our prior case law and unduly restrictive in its construction of our precious Bill of Rights, is one in which I cannot concur.") In addition, as TBI points out, *Paul v. Davis* reversed a Sixth Circuit decision, *Paul v. Davis*, 505 F.2d 1180, 1182 (6th Cir. 1974), in which the court had held that the Due Process Clause of the Fourteenth Amendment most certainly did protect the citizenry from stigmatizing publications by law enforcement officials. Although the Sixth Circuit's *Paul v. Davis* decision was decided several months after the parties entered into the 1974 consent decree, it may be relied upon to demonstrate the state of the law in the Sixth Circuit at that time. Accordingly, whether or not *Paul v. Davis* constituted a change in law in every jurisdiction, it did constitute a change in law in the relevant jurisdiction for this case: this one.

The plaintiff has argued that, notwithstanding *Paul v. Davis*' shift, the 1974 consent decree continues to enjoin behavior that is protected by the Constitution. That is, the plaintiff argues that, because the stigma associated with the "johns" website is likely to have some effect on the employment options of the "johns," it falls within the protected behavior demarcated in the *Paul v. Davis* opinion. In fact, the plaintiff goes so far as to suggest that the 1974 consent decree "anticipated" *Paul v. Davis*. This is all wishful thinking. It is difficult to conceive of a stigma-related Due Process claim that would not satisfy *Paul v. Davis*, as the plaintiff would

construe that opinion.  However, *Paul v. Davis* did more than require that plaintiffs link a stigma-related harm to a possible, or even likely, employment effect.  Instead, *Paul v. Davis* required that stigma-related harms come "in the course of" an economic deprivation in order to be actionable.  424 U.S. at 710.  Otherwise the plaintiff in *Paul v. Davis*—who was warned by his employer regarding his appearance on a shoplifting poster—would have fit within the economic deprivation framework himself.

There is little to distinguish the facts in this case from the facts of *Paul v. Davis*.  In the case at hand, the plaintiff alleges that a website that publishes the names and photographs of persons arrested for prostitution-related offenses violates the Due Process Clause of the 14th Amendment.  In *Paul v. Davis*, the plaintiff alleged that police officials had violated the Due Process Clause by publishing the same information, albeit for the lesser crime of shop-lifting, by posting flyers.  One can imagine negative economic consequences that could arise from either fact pattern, but that is not the test established by *Paul v. Davis*.  Instead, the stigmatizing publication must come in the course of an economic deprivation.  Neither the stigmatizing publication in *Paul v. Davis* nor that alleged in this case meets that test.

The plaintiff cites numerous cases applying the *Paul v. Davis* "stigma plus" doctrine in various contexts in an attempt to demonstrate that, even in the wake of *Paul v. Davis,* the 1974 consent decree continues to protect a constitutional right.  However, examination of each of those cases reveals a specific, articulated employment interest.  For instance, *Owen v. Independence*, 445 U.S. 622, 624 (1980) involved a chief of police's discharge from his position by the city manager in conjunction with an investigation of the department's record-keeping.  In *Owen*, "the defamatory and stigmatizing charges certainly 'occur[red] in the course of the

30

termination of employment,'" *Id.* at 133, n. 13 (citing *Paul v. Davis*, 424 U.S. at 710; *see also Scoliono v. Newport News*, 480 F.3d 642, 646 (4th Cir. 2007) (involving city employees' placement of allegedly false information in a probationary police officer's personnel file at work); *Dupoy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005) (involving the Illinois Department of Children and Family Services' direct contact with the employers of individuals who had been reported for child abuse or neglect and whose employment provided contact with children).

In *Ferencz v. Hairston*, 119 F. 3d 1244, 1249 (6th Cir. 1997), the Sixth Circuit addressed the parameters of the Due Process "stigma plus" right, holding that remodeling contractors whose names had been removed from a list compiled by the City of Toledo's Department of Community Development from which bids were solicited for public rehabilitation projects had not established a protected liberty interest. The court reasoned that, "[l]ike the plaintiff in *Paul*, the plaintiffs here cannot claim any 'right or status previously recognized by state law [that] was distinctly altered or extinguished' by removal of their names from the bid list.'" (*Id.*) (quoting *Paul v. Davis*, 424 U.S. at 711). The Sixth Circuit concluded that, "[b]ecause the publication complained of, even if defamatory, was not accompanied by the deprivation of any more tangible interest such as continued employment, the publication did not deprive the plaintiffs of a liberty interest." *Id.*; *see also Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996) ("[O]ne's criminal history is arguably not a private 'personal matter' at all, since arrest and conviction information are matters of public record.") (citing *Paul v. Davis*, 424 U.S. 693).

Under *Paul v. Davis* (especially as interpreted by the Sixth Circuit in *Ferencz*), the 1974 consent decree no longer protects a constitutional right. This fact is well illustrated by a comparison between the 1974 consent decree and the earlier consent decree, issued in 1973. The

31

1973 decree—which bars the defendants "from inquiring about, obtaining, or using any information regarding any arrests which have not resulted in a criminal trial or conviction for criminal activities, when considering applicants for employment with the Metropolitan Government or the Metropolitan Board of Education"—clearly invokes a *Paul v. Davis* right. The right protected by the 1973 decree is economic in nature; it is still protected under *Paul v. Davis*. The 1974 decree, however, simply bans all dissemination of arrest records. Under *Paul v. Davis*, this goes too far. There is no longer a constitutional basis for banning dissemination of these records.

That the public dissemination of arrest records itself could potentially have an economic consequence is undeniable; however, the 1974 decree is not limited to those economic consequences. Instead, the 1974 decree encompasses *all* dissemination of arrest records, regardless of whether the dissemination impacts economic rights in any way. The holding of *Paul v. Davis*, to the contrary, requires a more tangible connection. Under the current state of the law in the Sixth Circuit, Due Process protects only against stigmatizing publications that are directly related to specific economic deprivations. To put it simply, the law in the Sixth Circuit has changed. Accordingly, the behavior enjoined by the 1974 consent decree is no longer protected by the Constitution.

### B.     Modification Due to a Clarification of Law

Even if the court were to find that *Paul v. Davis* did not constitute a change in the law, it would find that, instead, the decision constituted a clarification of the law about which the parties to the 1974 decree were mistaken. Certain language of the majority opinion in *Paul v. Davis* is perhaps more consistent with a finding that the opinion clarified a misapplication of

32

*Constantineau* by the lower courts.[7]  Certainly, *Paul v. Davis* did not overturn *Constantineau*'s holding.  Instead, the Court focused on an alternate basis for the holding, stating that *Constantineau* and earlier cases did "not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause."  *Id*. at 701.

In light of the fact that certain language in *Constantineau* could be read as establishing a Due Process right in reputation alone, and in light of the close proximity between the issuance of the *Constantineau* decision and the 1974 consent decree, it appears very likely that the parties to the consent decree believed that the Due Process Clause did protect reputation interests.  This belief would go a long way towards explaining why the parties would agree to limit the dissemination of arrest records of all persons who had not been convicted of crimes.

Further evidence of this belief can be found in the introductory paragraph of the consent decree itself, which states that the Order was entered into "[b]y agreement of the parties, and in

_____

[7]In *Ferencz v. Hairston*, the Sixth Circuit noted that:

> In *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), the Supreme Court stated that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id.* at 437, 91 S.Ct. at 510. The Court, however, later clarified this language in *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), stating that this language "referred to the fact that the governmental action taken in that case deprived the individual of a right previously held under state law-the right to purchase or obtain liquor in common with the rest of the citizenry."

119 F.3d at1249.  The plaintiff has marshaled this language in favor of his argument that the *Paul v. Davis* decision did not change, but merely clarified, the law.  The court in *Ferencz*, most likely, did not choose the word "clarify" with the intent to foreclose the possibility that *Paul v. Davis* also changed the law.  However, as discussed below, even if the court were to determine that *Paul v. Davis* did clarify, instead of change, the law enunciated in *Constantineau*, the defendants would still have a viable avenue for modifying the consent decree.

33

recognition of the constitutional rights of Plaintiff and the class he represents."  This belief is also reflected in the plaintiff's memorandum of law in opposition to the motion to dismiss in the 1974 action, which stated that the "solicitude for individual rights has received substantial judicial approval and support in one long line of cases that has barred indiscriminate grouping of persons, *and in another line that has given constitutional protection to individual interests avoiding arbitrary stigmatization by government*."  (Original Docket No. 11 at p. 2-3; Docket No. 51 at p. 4) (emphasis added)

*Paul v. Davis* found that this line of cases did not, in fact, protect individuals from arbitrary stigmatization by the government.  Accordingly, unless *Paul v. Davis* can be said to have overturned those cases, the parties' beliefs at the time that such a right existed was mistaken.  Therefore, modification would also be appropriate if the court were to construe *Paul v. Davis* as instituting a clarification of law.

### C.  The Appropriate Remedy

There remains the issue of whether vacating the consent decree is the proper course of action, or whether modifying it in some other way is more appropriate at this time.  In *Rufo*, 502 U.S. at 391, the Court held that "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor."  Instead, "[o]nce a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances."  *Id*.  The court should "do no more" because "a consent decree is a final judgment;" however, "[w]ithin these constraints, the public interest and '[c]onsiderations based on the allocation of powers within our federal system' require that the district court defer to local

34

government administrators." *Id.*

In *Sweeton*, 27 F.3d at 1166, the Sixth Circuit was very clear that, where "decisional law has changed so that the enjoined behavior, which once *might* have been a violation of federal law, is no longer a matter of federal law at all" the injunction must be vacated. In light of the fact that no federal right underpins the 1974 decree—as well as the fact that the "local government administrators" in this case appear to favor vacating the decree—the court can identify no reason that the 1974 consent decree should remain in effect. *C.f. Agostini v. Felton*, 521 U.S. 203, 216 (holding that "[a] court errs when it refuses to modify an injunction or consent decree in light of . . . changes" in statutory or decisional law); *Railway Employees v. Wright*, 364 U.S. 642, 652-53 (1961) (holding that a consent decree should be vacated under Rule 60(b) in light of amendments to the Railway Labor Act); *Evans v. City of Chicago*, 10 F.3d 474, 475 (7th Cir. 1993) (*en banc*) ("We meet en banc to consider whether a district court should require a unit of state or local government to abide by a consent decree that does not serve any federal interest. The answer is No, and the injunction based on the parties' agreement must therefore be vacated.")[8]

_____

[8]The plaintiff seeks to distinguish *Sweeton* on the basis that it involved a change in the law, whereas this case involves a clarification of the law. Assuming that this case does involve a clarification of law about which the parties were mistaken, and not a change in the law, (and assuming that there is a meaningful distinction between the two) the plaintiff's argument is unavailing. The court in *Sweeton* emphasized the fact that there existed no federal law underpinning the consent decree—and not the source of this state of affairs—as the basis for its holding. If the parties in *Sweeton* had come about their consent decree as a result of a mutual mistake of law (and a mistake in which the court itself was complicit) the result would not have been any different. 27 F.3d at 1166-67 ("The law changes and clarifies itself over time. Neither the doctrines of *res judicata* or waiver nor a proper respect for previously entered judgments requires that old injunctions remain in effect when the old law on which they were based has changed.") Moreover, in *Rufo*, the Supreme Court gave no inclination that a different standard should be applied in vacating a consent decree where there has been a clarification of law about which the parties were mistaken, as opposed to a change in the law. 502 U.S. at 390. These are

The plaintiff has marshaled the Supreme Court's oft-cited *dicta* that "parties may agree to provisions in a consent decree which exceed the requirements of federal law," *Suter v. Artist M*, 503 U.S. 347, 354 (1992), in arguing that, even if the 1974 consent decree protects a wide range of conduct for which no federal right of protection exists, the consent decree should nevertheless be upheld. The court does not find this argument to be convincing. Although courts do often cite this *dicta*, the plaintiff has offered no case—and the court has found none—where a consent decree has been upheld, even though the constitutional basis on which it was grounded has been eroded. Instead, courts have consistently vacated consent decrees where the underlying rights have dissipated. *See, e.g., Agostini*, 521 U.S. 203, 217-18 (1997) ("[P]etitioner's ability to satisfy the prerequisites of Rule 60(b)(5) hinges on whether our later Establishment Clause cases have so undermined [prior precedent] that it is no longer good law."); *Rufo*, 502 U.S. at 388 ("[M]odification of a consent decree may be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent). Although parties *may* agree to exceed legally defined requirements, that fact does not say very much when, due to a change in law or circumstance, a party no longer agrees to conform to its promise.

For instance, in *Pasadena City Bd. Of Ed. v. Spangler*, 427 U.S. 424, 434-38 (1976), the Supreme Court found that the district court had issued a consent decree requiring that there be no school in the Pasadena Unified School District with a majority of minority students enrolled, in the mistaken belief that "it had authority to impose this requirement." The Supreme Court found, however, that its subsequent decision in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971), had made clear that no such constitutional authority existed. *Id.* at

merely two avenues that lead to the same place.

36

435. The Court found that the intervening decision in *Swann*, combined with the parties'
apparent mistaken beliefs regarding the governing law at the time, made "a sufficiently
compelling case so that modification should have been ordered by the District Court." *Id*. at
438; *see also Associated Builders and Contractors, Saginaw Valley Area Chapter v. Department
of Labor and Economic Growth*, No. 91-10373-BC, 2007 WL 1017585 at * 3 (E.D. Mich, 2007)
("An injunction premised on a subsequently unavailing legal basis is susceptible to dissolution,
despite the importance of finality.")

The court sees no way to distinguish this authority. It may be the case that the parties
could, today, agree to the 1974 consent decree, but they have not. Instead they entered into that
agreement at a time when the law at least appeared to provide a constitutional basis for the
agreement. Now it does not. On this basis, the defendant parties to the agreement want it
dissolved. The Sixth Circuit has held that ongoing injunctions must be dissolved where "[t]he
foundation upon which the claim for injunctive relief has crumbled." *Sweeton*, 27 F.3d at 1166.
Such is the case at hand. Accordingly, the court must grant the defendants' motions to dissolve
the 1974 consent decree.

### D.    Arguments Raised by the Intervenors

As an additional basis, the intervenors have alleged that the 1974 consent decree, if
enforced, would violate their First Amendment rights of access to arrest information and that the
decree must be vacated on that basis. However, the Supreme Court has been very clear that the
First Amendment does not grant a right of access to arrest records. *See Los Angeles Police
Department v. United Reporting Publishing Corp.*, 528 U.S. 32, 40 (1999) ("California could
decide not to give out arrestee information at all without violating the First Amendment.");

37

*Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978) ("This Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control").

However, enforcement of the 1974 consent decree would violate state statutory rights under T.C.A. § 10-7-503, the Tennessee Public Records Act ("TPRA"), and under T.C.A. § 38-6-120. The Tennessee Public Records Act states that, except as provided, "all state, county and municipal records . . . shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law." T.C.A. § 10-7-503(a). The TPRA has been described as an "'all encompassing legislative attempt to cover all printed matter created or received by government in its official capacity.'" *Griffin v. City of Knoxville*, 821 S.W.2d 921, 923 (Tenn. 1991) (quoting *Bd. Of Educ. Of Memphis City Schools v. Memphis Publ'g Co.*, 585 S.W.2d 629, 630 (Tenn. Ct. App. 1979). The TPRA creates "a presumption of openness and expresses a clear legislative mandate favoring disclosure of government records." *Schneider v. The City of Jackson*, ---S.W.3d----, 2007 WL 1514957 at *5 (Tenn. May 25, 2007); *see also State v. Cawood,* 134 S.W.3d 159, 165 (Tenn. 2004); *Tennessean v. Elec. Power Bd.,* 979 S.W.2d 297, 305 (Tenn. 1998); *Arnold v. City of Chattanooga,* 19 S.W.3d 779, 785 (Tenn. Ct. App. 1999).

In *Schneider*, 2007 WL 1514957 at *6-7, the Tennessee Supreme Court addressed whether the TPRA included a law enforcement privilege that excepted from its purview certain "field interview cards" and financial records sought by a newspaper and its reporters. The court held that no such exception applied to the act, reasoning that "the law enforcement privilege has

38

never been adopted in Tennessee and thus is not a 'state law' exception to the Public Records Act." *Id*. at *7. The court noted that "the Public Records Act is not patterned on FOIA [the federal Freedom of Information Act]" and that public policy exceptions to the Act not provided expressly by statute were disfavored. *Id*.; *see also Cawood*, 134 S.W.3d at 166 (declining to make a public policy exception for exhibits used at a prostitution-related criminal trial).

Similarly, T.C.A. § 38-6-120 provides that the TBI must provide "persons in the private sector and noncriminal justice agencies" with criminal history information, upon payment of $29 per name submitted. That section creates a statutory right to criminal arrest records in addition to the right under the TPRA, both of which are currently barred by the 1974 consent decree. While a statutory right of access could not prevail over the consent decree if the consent decree protected a constitutional right, in light of the fact that the 1974 consent decree has been found not to implicate any constitutional rights, those statutory rights provide another strong basis for vacating the decree.

Moreover, the court can identify no portion of the 1974 decree that could remain in force that would not be duplicative of the 1973 decree. As the plaintiff points out, the 1973 decree clearly does protect the constitutional right outlined in *Paul v. Davis* and, for that reason, must remain in force. But the 1974 decree does not provide any additional protection to that right which does not run afoul of the public policy expressed in Tennessee law. Contrary to the plaintiff's assertions, the 1974 decree is not a means of enforcing the 1973 decree; the 1973 decree is self-enforcing and does not require another consent decree in order to be effective. The existence of the 1973 decree does not provide a justification for keeping some remnant of the 1974 decree in place, but is instead strong counsel in favor of vacating the 1974 decree. The

39

1973 decree ensures that the plaintiff's *Paul v. Davis* right remains protected. Accordingly, the court finds that the 1974 decree should be vacated.

## **CONCLUSION**

For the reasons stated herein, the plaintiff's Motion to Assure Compliance will be denied, and the defendants' and intervenors' Motions to Dissolve will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge