UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )     Case No. 3:73-6971 |
| | )     Judge Trauger |
| v. | ) |
| | ) |
| BEVERLY BRILEY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

Pending before the court are: (1) The Metropolitan Government of Nashville and

Davidson County's ("Metro's") renewed Motion to Vacate 1973 Consent Decree (Docket No.

65), to which the plaintiff has responded (Docket No. 93), Metro has filed a reply in support

(Docket No. 105), and the plaintiff has filed a sur-reply (Docket No. 119); (2) the plaintiff's

Motion for Contempt (Docket No. 88), to which Metro has responded (Docket No. 94), the

plaintiff has filed a reply in support (Docket No. 114), and Metro has filed a sur-reply (Docket

No. 117).  Metro has also filed a Motion to Strike (Docket No. 120), to which the plaintiff has

responded (Docket No. 121).

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On September 19, 1973 a single-page Order ("the 1973 Consent Decree") was entered by

the court in this case.  In relevant part, that Order states as follows:

> In recognition that fundamental constitutional rights of liberty and privacy are
> threatened by the use of arrest information by employers, the Metropolitan
> Government of Nashville and Davidson County Tennessee will henceforth refrain

1

from inquiring about, obtaining, or using any information regarding any arrests which have not resulted in a criminal trial or conviction for criminal activities, when considering applicants for employment with the Metropolitan Government or the Metropolitan Board of Education at the present or in the future.

This Order is entered pursuant to stipulation of the parties evidenced by their attorneys' signatures below . . . .
(Docket No. 19 Ex. A.)

The Consent Decree is signed by Judge Morton, who was presiding over this case at the time, counsel for the plaintiff James F. Blumstein, and Larry Snedeker, who signed as counsel on behalf of "defendants Beverly Briley, Hugh Mott, Sam L. Felts, Jr., Felix V. Wilson, Mrs. Edith Whitley, John Andrew Sorace, W.C. Greer, Joe L. Huggins, and Ben Haris," who had been sued by the plaintiff "in their official capacities as officials of the Metropolitan Nashville-Davidson County Government." (*Id.*; Docket No. 1.)

There is no dispute that the 1973 Consent Decree remained in place, but largely forgotten about (at least by Metro) until July 17, 2006, when the plaintiff filed a Motion for Further Relief to Assure Compliance (Docket No. 2). While this motion mentioned the 1973 Consent Decree, its primary focus was a March 22, 1974 Consent Decree (entered into by the same parties in this case), which limited Metro's dissemination of arrest records (where no conviction had resulted) to law-enforcement personnel for law-enforcement purposes. (Docket No. 2 Ex. A.)

Indeed, in July 2005, the Metro Nashville Police Department began posting pictures of alleged patrons of prostitution, and other individuals arrested in prostitution stings, on the Internet. (Docket No. 3 Ex. 2.) The plaintiff maintained that this program clearly ran afoul of the 1974 Consent Decree and also implicated the 1973 Consent Decree. (Docket No. 3 at 2.) The plaintiff, therefore, resumed this litigation by filing the Motion for Further Relief.

The subsequent litigation (including intervention by *The Tennessean* newspaper and the

2

NewsChannel 5 television network) squarely focused on the 1974 Consent Decree and the broad

restrictions on Metro's disseminating arrest information to the public and the media. (*See*

Docket Nos. 40-41.) Several defendants moved to dissolve the 1974 Consent Decree, and, in a

September 28, 2007 Memorandum, the court found: (1) the plaintiff had standing; (2) the

motions to dissolve the 1974 Consent Decree were timely; (3) the 1974 Consent Decree applied

prospectively to all those arrested but not yet convicted; and (4) the 1974 Consent Decree should

be vacated because of an intervening change in controlling law, that is, "the behavior enjoined

by the 1974 consent decree is no longer protected by the Constitution." (Docket No. 61 at 32-

37.) Therefore, the court dismissed the case. (Docket No. 62.)

 While the clear focus of the September 28, 2007 Memorandum was on the 1974 Consent

Decree, the opinion did briefly contrast the two decrees. As stated therein:

> In *Paul v. Davis*, 424 U.S. 693, 706-10 (1976), . . . the Court held that there existed no
> constitutional right of privacy from stigma and public humiliation. *Id*. . . . Defamation,
> in [and] of itself, did not implicate the Due Process Clause and, instead, defamatory
> remarks had to come "in the course of" the deprivation of an economic right in order to
> be protected. *Id*. at 710. . . .
>
> Under *Paul v. Davis* . . . the 1974 consent decree no longer protects a constitutional right.
> This fact is well illustrated by a comparison between the 1974 consent decree and the
> earlier consent decree, issued in 1973. The 1973 decree . . . clearly invokes a *Paul v.
> Davis* right. The right protected by the 1973 decree is economic in nature; it is still
> protected under *Paul v. Davis*. The 1974 decree, however, simply bans all dissemination
> of arrest records. . . . Under the current state of the law in the Sixth Circuit, Due Process
> protects only against stigmatizing publications that are directly related to specific
> economic deprivations. To put it simply, the law in the Sixth Circuit has changed.
> Accordingly, the behavior enjoined by the 1974 consent decree is no longer protected by
> the Constitution. . . .
>
> As the plaintiff points out, the 1973 decree clearly does protect the constitutional right
> outlined in *Paul v. Davis* and, for that reason, must remain in force.
> (*Id.* at 28-39.)(internal citation and quotation omitted)
>
> On October 18, 2007, the plaintiff appealed the court's ruling vacating the 1974 Consent

Decree. (Docket No. 64.) Metro filed its Motion to Vacate 1973 Consent Decree on October 22, 2007, arguing that, despite the court's language in the September 28, 2007 Memorandum, the 1973 Consent Decree "does not protect a constitutional interest" because, despite how it appears at "first glance," it "does not even tangentially address the actual concern raised by *Paul v. Davis.*" (Docket No. 66 at 2-4.) The plaintiff objected to the motion on jurisdictional grounds given the pendency of the appeal, and the court, agreeing with the plaintiff on the jurisdictional issue, denied Metro's Motion to Vacate without prejudice. (Docket No. 80.)

On April 16, 2009, the Sixth Circuit issued its opinion, affirming the court's September 28, 2007 Memorandum and Order. (Docket No. 82.) Consistent with the record to that date, the Sixth Circuit touched on the 1973 Consent Decree only in passing. The Sixth Circuit recognized that the 1973 Consent Decree "remains in effect and is not challenged here." (*Id.* at 3.) The Sixth Circuit then affirmed the court's decision that the motions to dissolve the 1974 Consent Decree were timely and that the 1974 Consent Decree should be vacated. (*Id.* at 5-10.)

On August 6, 2010, Metro filed a "Motion to Supplement" the October 22, 2007 Motion to Vacate, asserting that there had been "an additional significant change in the law which justifies dissolving the 1973 Decree." (Docket No. 84 Ex. 1 at 3.) Specifically, Metro claimed that, under federal regulations, it could not receive federal funding for the "Head Start" program in its preschools unless it gathered arrest information for job applicants at the preschools, in violation of the 1973 Consent Decree. (*Id.* at 4.)

After limited briefing, Metro recognized that it should have moved to renew the October 22, 2007 motion, which it did. (Docket No. 90.) The court, therefore, denied the Motion to Supplement as moot and granted the motion to renew. (Docket No. 92.) Full briefing of the

Motion to Vacate has now occurred.  Additionally, the parties have exhaustively briefed the plaintiff's Motion for Contempt, which was filed on September 15, 2010 and maintains that Metro is in contempt for violating the 1973 Consent Decree.

## ANALYSIS

### I.      Motion for Contempt

The plaintiff maintains that Metro has clearly not abided by the "clear and unambiguous" obligations imposed by the 1973 Consent Decree.  (Docket No. 88 Ex. 1 at 2.)  The plaintiff also reiterates the settled point that a motion to vacate or modify a consent decree is "no defense to a motion seeking to punish a defendant's *past* failure to comply with it."  (*Id.* at 3 quoting *Doe v. Briley*, 562 F.3d 777, 782 (6th Cir. 2009)(emphasis in opinion)).  That is, "disobedience of [] an outstanding order of a federal court subjects the violator to contempt even though his constitutional claim might be later upheld."  *Pasadena City Bd. of Education v. Spangler*, 427 U.S. 424, 439-40 (1976).

The plaintiff asks the court to find Metro in contempt of the 1973 Consent Decree and to "order appropriate discovery to uncover the nature, scope, and depth of Metro's noncompliance . . . . such discovery should determine the nature and scope of the appropriate remedy."  (Docket No. 88 Ex. 1 at 3-4.)[1]  That is, it is not appropriate at this time for the court to fashion a remedy for the contempt, as discovery is necessary to determine the scope and consequences of that contempt.  (Docket No. 93 at 4.)

_____

[1]While Metro advanced the "Head Start" issue in support of its Motion to Vacate, the plaintiff argues in the Motion for Contempt that the presence of the federal regulations cited by Metro have little bearing on the basic fact of Metro's broad contempt.  (Docket No. 88 Ex. 1 at 7.)

5

In response, Metro "concedes that it has not fully complied with the 1973 Decree throughout the past 37 years and that its current government officials were unaware of even the existence of the 1973 Decree until the resurrection of this lawsuit in 2006." (Docket No. 94 at 2.) Yet, Metro claims, it should not be held in contempt because the 1973 Decree is "void" as Metro attorney, Larry Snedeker, "exceeded his authority" in binding Metro to the dictates of the 1973 Consent Decree. (*Id.* at 1-3.)

Indeed, Metro claims that, "when a party or attorney enters into a consent decree without proper authority to do so and without following proper regulatory or legal procedures, that decree is void." (*Id.* at 3 citing *U.S v. Beebe*, 180 U.S. 343 (1901); *Cobb v. Aytch*, 539 F.2d 297 (3rd Cir. 1976); *National Revenue Corp. v. Violet*, 807 F.2d 285 (1st Cir. 1986); *Black v. City of Atlanta*, 61 F.3d 27, 29 (11 Cir. 1995)(applying Georgia law and holding that the settlement entered into by city attorneys was invalid because the attorneys did not obtain approval from city counsel prior to entering into the settlement agreement)).

In terms of controlling authority, both *Beebe* and the relatively more recent *U.S. v. 32.40 Acres of Land*, 614 F.2d 108, 113-14 (6th Cir. 1980) stand for the proposition that the United States may be relieved from its obligations under a court-imposed settlement agreement when the official entering into the settlement agreement on behalf of the United States indisputably acted without required statutory authorization. Additionally, the Sixth Circuit has held that, where an injunction was "erroneously issued" and "never should have been passed," the plaintiff does not have a legal right to recover for civil contempt of that order. *Garrison v. Cassens Transport Co.*, 334 F.3d 528, 543 (6th Cir. 2003).

Metro argues that, in 1973, the Metro Code of Laws only authorized the Metro attorney

6

"to settle any claim against the metropolitan government not in excess of one thousand dollars," and that, beyond this, "all settlements and compromises" had to be approved by the Metro Council or relevant Metro Board. (Docket No. 94 at 5.) Relying on various declarations from various Metro employees (none of whom were employed by Metro in 1973), Metro then launches into a lengthy discussion of the procedural hurdles that this consent decree apparently failed to clear, pointing out that the relevant commission meeting minutes contain no discussion of the decree or underlying lawsuit. (*Id.* at 6-8.) That is, in the absence of any indication that the relevant boards and commissions approved the 1973 Consent Decree, Snedeker "unilaterally" bound "every board, commission, department or elected or appointed office in the Metropolitan Government, in perpetuity, to specific hiring policies and procedures," which was well outside of the limited authority to settle lawsuits afforded to the attorney by the Metro Code. (*Id.*)

In his reply, the plaintiff maintains that "Metro was not and could not have been a party when this lawsuit was filed," because, under "then prevailing doctrine," municipalities could not have been sued for injunctive and declaratory relief under Section 1983. (Docket No. 114 at 4-6 citing *Monroe v. Pape*, 365 U.S. 167, 187-192 (1961); *City of Kenosha v. Bruno*, 412 U.S. 507, 510 (1973)). Because, when this case was filed, the authority to sue municipalities provided by *Monell v. Department of Social Services*, 436 U.S. 658 (1978) was still several years away, the plaintiff appropriately named a series of Metro officers in their official capacities and sued for declaratory and injunctive relief only (as litigants do now when challenging the constitutionality of a state official's action and seeking prospective relief that will ultimately be provided by the state entity). (*Id.*) As Metro was never sued, its "contentions regarding approval authority" are "far off base." (*Id.* at 6.)

7

Moreover, the plaintiff claims, Snedeker was well within the scope of the charter provision when he agreed to settle this case. First, the suit was not "against the metropolitan government" because Metro could not be sued in this case at that time and, second, the suit did not seek monetary relief and was "not in excess of $1,000." (*Id.* at 6-7.) That is, there is nothing brought forth by Metro to indicate that, in 1973, Snedeker did not have authority to settle a non-damages claim against Metro employees in their official capacities. (*Id.* at 7-8.)

In its sur-reply, Metro maintains that if it was not, as the plaintiff maintains, a party to the 1973 Consent Decree, then it cannot now be held in contempt of that decree. (Docket No. 117 at 2.)[2] And again, even if Metro was somehow subject to the decree, "there is no indication" that the appropriate procedures were followed in terms of "formal approval" of that decree by the relevant "boards, commissions, or departments," and, therefore, Metro cannot be bound (*Id.* at 8.)

Simply, the court is not persuaded by what the plaintiff refers to as Metro's "Hail Mary" pass. First, on a literal reading of the charter provision involved, Snedeker had authority to bind Metro to the agreement because the suit was non-monetary, or did not exceed $1,000. As the plaintiff argues, Metro has not pointed to any charter provision indicating that, at this time, Metro's counsel was required to submit settlements of non-monetary claims up a chain of command. Rather, Metro relies on the alleged absence of any indication that the procedures that

---

[2]Metro also asserts that it could have been sued in its own name in 1973 but recognizes that the plaintiff would have had to assert a Fourteenth Amendment claim that included a claim for damages. (*Id.* citing *Thomas v. Shipka*, 818 F.2d 496, 501 (6th Cir. 1987)). Metro also argues that there is no authority for the proposition that Metro could become "retroactively bound" to the consent decree when the *Monell* decision was issued in 1978. (*Id.* at 3 citing, counterfactually, *Brandon v. Holt*, 469 U.S. 464 (1985)).

it now claims should have been followed were indeed followed.  It is not surprising that clear evidence of authorization or lack thereof, in some form, is no longer available, given that Metro "slept on its rights" for more than three decades.

Moreover, even if Metro did come forward with evidence that not every "i" was dotted or every "t" crossed within Metro, in the absence of any clear, controlling precedent, the court would not be inclined to credit such a weak and *post-hoc* argument, particularly in the face of clear contempt.  Both *Beebe* and *32.40 Acres of Land* concerned federal officials who had plainly exceeded their authority in entering into a settlement decree, and, upon the federal government's relatively brisk action (two months in *32.40 Acres of Land*) to set aside the decree, the court found that, because it was clear that the official had acted outside the scope of his authority, the decree should be set aside.  In contrast, here, Metro, 37 years after the fact, claims that its own lawyer acted outside of the scope of his authority.

Moreover, the court is not troubled by the fact that the plaintiff sued a series of Metro officials in their official capacities and now seeks to bind Metro.  There appears to be no dispute that, at this time, this was the appropriate manner to prospectively alter Metro's behavior in a litigation that did not seek damages.  Additionally, there is no dispute that the 1973 Consent Decree was entered into by a Metro attorney, who, all indications are, was acting on behalf of the Metro government and in conjunction with senior Metro officials.  Moreover, the Consent Decree, by its very terms, does not bind the individual defendants to the suit but, rather, binds Metro.  Metro was obviously aware of this litigation and the 1973 Consent Decree.  Metro had decades to challenge these aspects of the 1973 Consent Decree and never did.  On these facts and

9

the law, there is no legitimate basis for the consent decree not to bind Metro.[3]

In light of all of this, the court finds Metro to be in contempt.  The issue, then, is how to proceed from here.  As noted above, the plaintiff requests that the court not order any specific relief at this time but allow discovery to uncover the depth of Metro's noncompliance with the 1973 Consent Decree.  Metro, on the other hand, suggests that any contempt discovery should be initially limited to an inquiry, undertaken by the plaintiff, to determine whether any individuals have actually been harmed by Metro's contempt.  (Docket No. 117 at 10-11.) Metro is certainly correct that unchecked discovery into an alleged nearly four decades of non-compliance with the 1973 Consent Decree would be expensive, exhausting and largely unproductive, given the length of time involved and the uncertainty as to what factors were used to evaluate a potential

---

[3]The plaintiff's sur-reply in support of his response to the Motion to Vacate contains about 10 pages of discussion of Metro's defense to the plaintiff's Motion for Contempt.  (Docket No. 119 at 1-10.)  In light of this, Metro filed a Motion to Strike, claiming that this argument amounted to an unauthorized "sur-sur-reply" in the Motion to Contempt briefing.  (Docket No. 120 at 1.)  Metro also points out that plaintiff's counsel, James F. Blumstein, was directed to file his sur-reply to the Motion to Vacate on December 1, 2010, the same date that Metro was to file its sur-reply to the Motion for Contempt.  (*Id.*)  On December 1, Metro filed its sur-reply, but Blumstein erroneously filed a previously filed document.  (*Id.* at 2.)  Then, on December 2, 2010, the plaintiff filed his sur-reply to the Motion to Vacate, which contained the arguments that concern the Motion for Contempt.  (Docket No. 119.)  Metro, without explicitly claiming that Blumstein intentionally filed the wrong document on December 1st, alleges that Blumstein still used the extra day to study Metro's sur-reply and raise additional argument in support of the Motion for Contempt.  (Docket No. 120 at 2.)  In response, Blumstein calls Metro's allegations "an unfounded and vicious slur" and claims that the plaintiff had completed his sur-reply by late afternoon on December 1, 2010 and that Blumstein directed his secretary to file the document at that time.  (Docket No. 121 at 2.)  However, Blumstein claims, his secretary filed the wrong document in the ECF system, a claim supported by an affidavit from Blumstein's secretary Renee Hawkins.  (Docket No. 121 Ex. A.)  While the court certainly does not believe that Blumstein acted dishonestly in this instance, there was no reason for the plaintiff's sur-reply on the Motion to Vacate to include 10 pages of additional argument on the Motion for Contempt.  That said, the arguments advanced therein reiterate the arguments previously made.  As the court would have reached the same conclusion without the questioned material, the Motion to Strike will be denied as moot.

10

candidate for employment.

After discussing the Motion to Vacate, the court will discuss how to proceed with this litigation generally and the Motion for Contempt discovery.

## II.    Motion to Vacate

### A.    Legal Standard

Federal courts "have always had the inherent equitable power to modify consent decrees imposing ongoing injunctive relief." *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994). Modification of a consent decree is, however, subject to Rule 60(b) of the Federal Rules of Civil Procedure, on the basis that, although "[a] consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature," it also "is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 378(1992) (citing *Railway Employees v. Wright*, 365 U.S. 642, 650-51 (1961)). Specifically, the Supreme Court has relied on subsections (5) and (6) of Rule 60(b) to modify a consent decree. *Id*. Rule 60(b) provides, in relevant part:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

In addressing consent decrees arising from institutional reform litigation, the Supreme Court has advocated a "flexible modification standard . . . because such decrees reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions." *Rufo*, 502 U.S. at 381 (internal

11

quotation omitted).  This more flexible standard is necessary because "such decrees often remain in place for extended periods of time [and] the likelihood of significant changes occurring during the life of the decree is increased." *Id*. at 380.  Accordingly, a party seeking modification of a consent decree may prevail upon showing "a significant change in circumstances," which may be met "by showing . . . a significant change either in factual conditions or in law." *Id*. at 383-4.

With regard to changes in law, "modification of a consent decree may be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent." *Id*. at 388.  In addition, "a decision that clarifies the law . . . could constitute a change in circumstances that would support modification if the parties had based their agreement on a misunderstanding of the governing law." *Id*. at 390. Also, "modification of a consent decree may be warranted when changed factual circumstances make compliance with the decree substantially more onerous." *Id.* at 384.

That said, the standard for obtaining relief from a consent decree requires a showing that it is no longer "equitable" that the judgment have prospective application, not just that the judgment is no longer "convenient." *Id.* at 383.  Also, a Rule 60(b)(5) proceeding is not an opportunity to "appeal" or "challenge the legal conclusions on which a prior judgment or order rests." *Horne v. Flores*, 129 S.Ct. 2579, 2593 (2009). A motion to modify or vacate a consent decree, rather, allows the movant an opportunity to show that "a significant change either in factual conditions or in law renders continued enforcement of the judgment detrimental to the public interest." *Id.* (internal quotation omitted).

### B. Metro's Position

#### I. Change in law

Metro argues that the 1973 Consent Decree should be vacated because it no longer protects a "federal interest." (Docket No. 66 at 3.) That is, while the court previously indicated that the 1973 Consent Decree did protect a *Paul v. Davis* right, the plaintiff's chief concern regarding the "impact that Metro's consideration of plaintiffs' arrest records could have on their ability to obtain gainful employment with Metro itself" is not a constitutionally protected interest. (*Id.* at 4.)

In support, Metro reiterates the settled point that "injury to reputation by itself" is not a liberty interest protected by the Fourteenth Amendment. *Paul v. Davis*, 424 U.S. 693, 708-09 (1976)). Metro concedes that government injury to reputation, combined with injury to "some more tangible interests such as employment," is sufficient to "invoke the procedural protection of the Due Process Clause." (Docket No. 66 at 4 quoting *Paul*, 424 U.S. at 701). However, Metro argues, it would misunderstand *Paul* and subsequent cases to conclude that the plaintiff has alleged a "stigma plus" injury.

Metro invokes in support *Siegert v. Gilley*, 500 U.S. 226 (1991). There, an employee resigned from government employment and sought another job. *Id.* at 228-29. When the former employer made a stigmatizing disclosure in response to the potential employer's qualifications inquiry, the plaintiff sued the government employer. *Id.* The Court found that the plaintiff had not suffered a constitutional injury because the stigmatizing disclosure "was not uttered incident to the termination of [the plaintiff's] employment," and, therefore, the disclosure was an injury to reputation alone. *Id.* at 234.

13

This holding – that the "stigmatizing statement must be made in conjunction with the plaintiff's termination from employment" – has been reiterated by the Sixth Circuit, which has announced a five-pronged test to aid courts in determining whether a liberty interest is implicated. *Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir. 1997). As relevant here, in addition to a stigmatizing statement, the plaintiff must allege that the statement was false, was made public voluntarily, and that it closed a "definite range of [employment] opportunity." *Id.* The Sixth Circuit has also concluded that, consistent with *Siegert*, the loss of opportunity "must occur at the same time as the claimed stigmatizing publication." *Mertik v. Blalock*, 983 F.2d 1353, 1363 (6th Cir. 1993).

Metro argues that, here, there have been no "stigmatizing disclosures." Rather, the 1973 Consent Decree prevents Metro from considering arrest records in making employment decisions, something that does not implicate a "disclosure," let alone a false one that forecloses a "range of opportunity." (Docket No. 66 at 6-7). In short, Metro argues that the 1973 Consent Decree was based upon the same misconception – corrected by *Paul* in 1976 – as the 1974 Consent Decree; that is, that injury to reputation alone is broadly protected under the Fourteenth Amendment. (*Id.* at 9.) Indeed, it is now clear that injury to reputation in the employment context is actionable (from a Section 1983 perspective) under a very narrow set of circumstances. (*Id.*) As it is apparent that the plaintiff does not claim a valid constitutional interest, the time has come to dissolve the 1973 Consent Decree. (*Id.* at 10.)

14

### ii. Change in factual circumstances

Metro, primarily in its reply brief, also maintains that changed factual circumstances justify dissolving the 1973 Consent Decree. (Docket No. 105 at 6.) Metro maintains that, since the 1973 Consent Decree was entered, numerous state laws have been passed that require the use of background checks for potential government employees, including police officers and school employees. (*Id.* at 7.) As discussed above, Metro also maintains that its Head Start federal funding is at risk if it complies with the 1973 Consent Decree, as Head Start dictates that a "criminal record check . . . as required by State law," be conducted of prospective employees and explicitly requires government employers to investigate and consider whether a prospective employee has been arrested for child sexual abuse. 45 C.F.R. § 1301.31(b).

Metro also argues that "vast technological advances" since 1973 have changed the landscape when it comes to considering applications for employment. (Docket No. 105 at 9.) Metro maintains that anyone can access state court records using the Internet and obtain an "individual's detailed criminal history." (*Id.* at 10.) With the added knowledge, Metro argues, comes added responsibility. That is, an employer is naturally subject to a higher and broader duty of care when it comes to considering applicants for employment, and it would be unfair to restrict Metro from using the same information regarding arrests to which every employer has access. (*Id.*) Moreover, as information on convictions and arrests is generally produced together in a standard electronic background check, Metro is left in a "virtually impossible" situation of trying to obtain information on convictions without, at the same time, violating the 1973 Consent Decree.

15

## C.       The Plaintiff's Position

The plaintiff makes three main arguments in response: (1) Metro's Motion to Vacate is not timely; (2) Metro's motion is barred by the claim preclusion doctrine; and, (3) the circumstances do not warrant a dissolution of the 1973 Consent Decree.  (Docket No. 93.)  These first two arguments are easily rejected, and the court will briefly address them before turning back to the merits of this dispute.

### i.       Timeliness

The plaintiff objects to the pending Motion to Vacate as untimely.  The Sixth Circuit discussed and rejected a nearly identical argument raised in response to the motions to dissolve the 1974 Consent Decree.  (Docket No. 82 at 4.)

It is well settled that the timeliness of a Rule 60(b)(5) motion is judged by a broad reasonableness analysis that considers "the length of the delay, the explanations for the delay, the prejudice to the opposing party caused by the delay and the circumstances warranting relief."  *Assoc. Builders v. Mich. Dept. of Labor*, 543 F.3d 275, 278 (6th Cir. 2008).  Additionally, the court considers "the nature of the dispute and whether it involves a purely private disagreement or a matter of public interest."  *Id.*

Applying these factors and recognizing that the delay (more than a few decades) had been lengthy and the justification for the delay (essentially that the decree was "forgotten" about) was "hardly compelling," the Sixth Circuit still found that it was proper for this court to have entertained the motions to dissolve the 1974 Consent Decree.  (Docket No. 82 at 5.)  The Sixth Circuit noted that there was a "change in the

16

law" at issue that put "the foundation" of the 1974 Consent Decree in question and that the case plainly implicated a matter of "public concern." (*Id.*) Additionally, if the motion were rejected on timeliness grounds, Metro employees, in essence, would be forever bound by the dictates of the decree, as a future motion to vacate would certainly not be more timely. (*Id.*) Finally, the plaintiff had not identified a "shred of prejudice" flowing from the delay. (*Id.*) In light of all of this, the Sixth Circuit determined that the multi-decade delay did not justify refusing to entertain the motions. (*Id.*)

Essentially, the timeliness argument is identical here. There is no question that there was a lengthy delay and that Metro's excuse is not compelling. However, once again, Metro puts forth authority for the proposition that important changes in circumstance over a several-decade period have challenged the "foundation" on which the decree was based. Also, while the 1973 Consent Decree may not raise matters of public concern to the same degree as the 1974 Consent Decree (which implicated the rights of the press, among other things), there is clearly a strong public interest in the factors that a municipality may use to hire teachers, police officers, child care workers, and emergency personnel, among others. And, finally, the plaintiff does not convincingly put forth evidence that he has been significantly prejudiced by any delay.[4]

_____

[4] The plaintiff claims that, "by withholding its filing of its motion to vacate the 1973 Decree" until after the court's ruling on the 1974 Consent Decree, "Metro was able to defeat plaintiffs' request for discovery regarding compliance with the 1973 [Decree] through its silence." (Docket No. 93 at 8.) That is, if Metro had conceded to its non-compliance with the 1973 Consent Decree earlier in the revived litigation, the court would have ordered discovery into compliance with the 1973 Consent Decree, and this discovery could have altered the court's ruling on the Motion to Vacate the 1974 Consent Decree. (*Id.*) This argument is speculative and unsupported (particularly given the legal basis for vacating the 1974 Consent Decree), and any prejudice to the plaintiff certainly does not outweigh the compelling bases for at least

17

Therefore, again, the court rejects the plaintiff's timeliness argument.

### ii.    Claim preclusion

The plaintiff also argues that "the doctrine of claim preclusion reinforces the contention that Metro's motion to vacate the 1973 Decree was not timely filed." (Docket No. 93 at 12.) Claim preclusion generally bars a litigant from asserting a claim that should have been raised, but was not, in a prior suit between the same parties involving the same core facts. *Mitchell v. Chapman*, 343 F.3d 811, 819 (6th Cir. 2003). The plaintiff argues that Metro should have raised the validity of the 1973 Consent Decree prior to the dismissal of this case in 2007 and that its failure to do so (combined with its judicially inefficient "splitting" of the action) justifies not entertaining the motion to vacate at this point. (Docket No. 93 at 12-15 citing *e.g. Westwood Chem. Co. v. Kulick*, 656 F.2d 1224, 1229 (6th Cir. 1981)(discouraging parties from advancing "piecemeal" litigation)).

This argument is without merit. Simply, the doctrine of claim preclusion applies when a party attempts to raise new claims or issues in a second *case* involving the same parties and facts. *Heylinger v. State Univ. and College Sys. of Tenn.*, 126 F.3d 849, 854 (6th Cir. 1997). As Metro points out, "claim preclusion is not . . . a means of promoting efficient motion practice within the same lawsuit." (Docket No. 105 at 6.) Here, the natural flow of the litigation resulted in a focus on the 1974 Consent Decree, but, as soon as issues involving that decree were resolved, Metro, very quickly, moved to vacate the 1973 Consent Decree. Moreover, the court certified the appropriateness of Metro's

---

entertaining the Motion to Vacate.

action by denying the Motion to Vacate without prejudice.

### iii.    Merits of vacating/modifying – the plaintiff's position

While the plaintiff certainly notes that the court previously stated that the 1973 Consent Decree protects a *Paul v. Davis* right, the plaintiff argues that the 1973 Consent Decree more directly protects a right elucidated by the Supreme Court in *Schware v. Board of Bar Examiners*, 353 U.S. 232 (1957).  (Docket No. 93 at 18.)  In *Schware*, the Supreme Court determined that the New Mexico Board of Bar Examiners, in denying the plaintiff's application to the bar due to his allegedly inadequate moral character, had denied the plaintiff the protections of due process.  353 U.S. at 247.   While the Court recognized that the state Bar could set a "moral character" restriction, the state Bar denied the plaintiff due process because there was nothing "in the record which suggests that Schware has engaged in any conduct during the past 15 years which reflects adversely on his character."  *Id.* at 239.

The state Bar had found fault with the plaintiff's moral character because the plaintiff had: (1) "used certain aliases," (2) given an "assumed name" to the police on one occasion, (3) been arrested twice during labor protests and once for apparently recruiting individuals to aid one side in the Spanish Civil War, but no convictions resulted, and (4) been a member of the Communist Party.  *Id.* at 242-46.  The Court basically viewed these facts as evincing that the plaintiff was politically active during a turbulent time (the Great Depression and early World War II) and found insufficient evidence in the record demonstrating that the plaintiff lacked the moral character necessary to practice law.  *Id.*

While the Court did not hold that the state Bar's use of arrest records was *per se*

improper, it did state that "the mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense. When formal charges are not filed against the arrested person and he is released without trial, whatever probative force the arrest may have had is normally dissipated." *Id.* at 241.

The plaintiff maintains that *Schware* demonstrates that there are "constitutional concerns regarding the use of arrest records with respect to access to employment and professional opportunity." (Docket No. 93 at 19.) As *Schware* remains good law, the plaintiff argues that Metro cannot provide authority demonstrating that there has been a "significant change" in the controlling law. (*Id.* quoting *U.S. v. Tennessee*, 615 F.3d 646, (6th Cir. 2010)).

On the factual side, the plaintiff argues that the 1973 Consent Decree continues to be a "reasonable prophylactic remedy to safeguard a constitutionally protected interest." (Docket No. 93 at 21-22.) That is, the right under *Schware* to have employment or professional licensing decisions made on firm ground by governmental entities is reasonably protected by a system that prohibits Metro from using arrest records in making employment decisions. (*Id*; *see also Dean v. McWherter*, 70 F.3d 43, 45 (6th Cir. 1995)("freedom to pursue gainful employment is clearly a liberty interest deserving of due process protections.") Moreover, there is no requirement that a consent decree be limited to only provide the plaintiff with the constitutional minimum with regard to protection of the plaintiff's liberty interest. (*Id.* citing *Suter v. Artist M*, 503 U.S. 347,

20

354 (1992)).[5]

The plaintiff also maintains that Metro's allegations of changed factual circumstances are overstated. First, changes in state law do not necessitate the modification of a consent decree that is based on federal law. *U.S. v. Wayne County*, 369 F.3d 508, 515 (6th Cir. 2004). Moreover, the state laws cited by Metro regarding background checks mandate that the employer be apprised of convictions (not arrests) and, in mandating or authorizing background checks, they do not explicitly require that the employer consider arrests in those checks. (Docket No. 119 at 17-19 citing T.C.A. § 38-8-106(4)(police officers); T.C.A. § 68-102-308 (fire protection personnel); T.C.A. § 68-11-256 (nursing home employees); T.C.A.§ 49-5-413(a)(1)(A) (school teachers); T.C.A. § 68-140-525(a) (EMTs)).

While the plaintiff argues that Metro is vastly overstating the toll that the 1973 Consent Decree imposes on Head Start compliance, the plaintiff concedes that federal regulations do require that recipients of Head Start funding review arrest records to determine if a potential employee has been arrested for child sexual assault and then make a determination, in light of all of the circumstances, whether employment should be offered to the applicant. (Docket No. 119 at 23 citing 45 C.F.R. § 1301.31(b)). The plaintiff maintains that the proper method for resolving this issue would have been for

---

[5]The plaintiff spends several pages on the issue of whether it is appropriate for the court to consider changed factual circumstances as a basis for vacating the 1973 Consent Decree because Metro primarily relied on changed legal circumstances in its original Motion to Vacate. (Docket No. 119 at 10-15.) When the plaintiff raised this issue previously, the court indicated that it would allow the parties a full and complete opportunity to brief the relevant factual and legal issues in this case. (Docket No. 112.)

21

Metro to negotiate a proper narrowing of the decree with plaintiff's counsel. (*Id.*)

The plaintiff also contends that Metro's protestations regarding its heightened duty of care and the risk of "accidental violation of the 1973 Decree by receiving raw arrest records in a search for conviction records" are unsupported and not a basis for vacating a decree that remains supported by Supreme Court law. (*Id.* at 25.) Again, the plaintiff concedes that some modification to the 1973 Consent Decree might be required if Metro could show that it actually is at risk of "accidentally" violating the decree, but no such showing has been made and Metro has moved to vacate the decree, not modify it. (*Id.*)

### D.    Resolution

It is clear from the parties' briefing that – unlike with the 1974 Consent Decree – there has not been an intervening change in controlling law that has revealed that "the behavior enjoined . . . is no longer protected by the Constitution."  Rather, the plaintiff convincingly argues (without any substantive challenge from Metro) that *Schware* and subsequent cases such as *Dean v. McWherter* constitutionally protect an individual's opportunity to seek employment without unreasonable governmental intrusion.  That is, while it was not *per se* improper for the state Bar in *Schware* to consider arrest records, it was a denial of due process for that Bar to base its decision on dated arrest records that did not shed any light on the plaintiff's moral character.  From this, there is a strong argument that it would be a violation of an applicant's due process rights for Metro to *unreasonably* base its employment decisions on an applicant's previous arrests.

And, as the plaintiff argues, there is no requirement that a consent decree be

22

"narrowly tailored" to only provide the minimum level of constitutional protection. *Suter*, 503 U.S. at 354. That is, there is nothing *per se* improper about the fact that the 1973 Consent Decree provides considerable additional protection to the plaintiff's liberty interest than is constitutionally required.

All that said, there is a huge disconnect between the scope of the 1973 Consent Decree and the right that the plaintiff maintains it is designed to protect. While *Schware* indicates that it is constitutionally improper for a government actor to unreasonably rely on arrest records in making an employment decision, the 1973 Consent Decree prohibits Metro from even obtaining those records. If the potential violation of the plaintiff's rights represents a small campfire, the 1973 Consent Decree is an industrial-strength fire hose.

This disconnect is troubling because, as both parties recognize, changed circumstances over the intervening decades have made strict compliance with the 1973 Consent Decree legally and practically challenging. The plaintiff concedes that some modification of the 1973 Consent Decree is necessitated by the Head Start regulation regarding child sexual abuse arrests and, to the extent that background checks automatically generate "raw" arrest records, the requirement to conduct a background check as a condition of employment would likely result in accidental violations of the 1973 Consent Decree. Also, Metro is correct that the wider availability of arrest information would naturally create a societal expectation that an employer, including Metro, would "flag" an applicant's particularly troubling arrest information and at least consider that information when making an employment decision.

23

While Metro has not shown that the 1973 Consent Decree should be vacated, it is clear that the scope of the decree must be narrowed in light of changed societal circumstances. Again, the court is to approach modifications "flexibly." Plaintiff's counsel has repeatedly suggested in briefing that Metro should have come to him with its concerns about Head Start and that the parties should work together to iron out an appropriate modification. Indeed, the parties came to a joint resolution of these issues in 1973, and there is no apparent reason that they could not do so now.

Therefore, the case will proceed as follows. The court will suspend the operation of the 1973 Consent Decree to afford the parties an unfettered opportunity to research and negotiate a modification of the 1973 Consent Decree that will narrow the scope of the decree such that Metro can reasonably conduct background checks and comply with federal regulations and basic societal expectations, while still protecting the job applicant's liberty interests.[6] Within 120 days of the date of the Order accompanying this decision, the parties shall file either a modified proposed consent decree or a joint status report, explaining why it was not possible to achieve agreement on a modified decree. (If the parties state that they need more time to negotiate, the court will certainly permit the parties that time.) If and when the parties inform the court that private agreement between the parties appears impossible, the court will order mediation.

At the conclusion of the modification process, the court will endeavor to direct discovery into Metro's contempt of the 1973 Consent Decree. The court believes that the

---

[6]During this time period, Metro, of course, is required to maintain its constitutional obligations, including those established in *Schwar*e and *Paul v. Davis*.

24

most judicially economical way to resolve this case in total is to handle the modification and contempt issues separately, so that issues, tensions, and time pressures surrounding contempt discovery do not poison reasonable efforts to modify the 1973 Consent Decree. It is also hoped that research and negotiation into modification of the 1973 Consent Decree will illuminate potential avenues to settlement of the contempt issue.

## **CONCLUSION**

For the reasons discussed herein, Metro's Motion to Vacate will be granted in part and denied in part, the plaintiff's Motion for Contempt will be granted, and Metro's Motion to Strike will be denied as moot.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

25